[No. B206223. Second Dist., Div. Three. Apr. 24, 2009.]

ARLAN A. COHEN, Plaintiff and Respondent, v.
MICHAEL BROWN et al., Defendants and Appellants.

COUNSEL

Yee & Belilove, Steven R. Yee, Steve R. Belilove and Robert A. Hufnagel for Defendants and Appellants.

Cohen & Rudd and Arlan A. Cohen for Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—The defendants in this case, attorney Michael Brown and the California Lawyers Group, LLP,[1] have appealed from an order denying

---

[1] Plaintiff's complaint alleges Brown is the owner and operator of California Lawyers Group, LLP. Henceforth herein, we refer to Brown and his law firm collectively as "Brown."

their special motion to strike the plaintiff's first amended complaint (complaint). The motion was brought under Code of Civil Procedure section 425.16, the anti-SLAPP statute (§ 425.16; SLAPP—strategic lawsuit against public participation).[2]

The trial court denied the motion because it determined that the activities of Brown on which the special motion to strike the complaint is based were not acts taken by Brown as a valid exercise of his rights of petition or free speech (§ 425.16, subds. (a), (b)(1)), but rather constituted extortion and were therefore illegal. We find the court's analysis is correct and we will affirm the court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Underlying Action

According to plaintiff's complaint, the instant action has its beginnings in an earlier suit—a personal injury suit in which one Sidney Zerah (Zerah) sued two defendants, Dawnn Alane (Alane) and Irving Klein (Klein), after Klein made an illegal left turn into oncoming traffic in November 2005, and struck Alane's vehicle, which in turn struck Zerah's vehicle. Klein, who was in his 80's at the time, was cited for ignoring a traffic control device and

---

[2] Section 425.16 provides in relevant part: "(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

"(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subds. (a), (b)(1).)

Subdivision (e) of section 425.16 explains what is meant by the phrase, in subdivision (b)(1), "act . . . in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." That phrase "includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Orders granting or denying special motions to strike are appealable when made. (§ 425.16, subd. (i).)

making an unsafe turn. Zerah's car was totaled. Upon examination by physicians at the hospital to which he was taken, it was determined that Zerah's injuries included tears to both of his rotator cuffs necessitating surgery to both shoulders. After he was discharged from the hospital, however, Zerah noticed an onset of cognitive difficulties which materially compromised his ability to conduct the wholesale jewelry business which he and his brother operated. Between the family problems which the brother was experiencing and the cognitive difficulties being experienced by Zerah, the family business began to fail. Defendant Brown filed the underlying action against Alane, Klein and others, in June 2006, on behalf of Zerah, alleging they negligently caused the harm to Zerah.

### 2. *Plaintiff Associates into the Underlying Action*

In his complaint, plaintiff alleges that he was associated into the underlying case in the following manner. In July 2007 defendant Brown contacted plaintiff and asked him to associate in and assist Brown by handling the medical experts in the case because plaintiff is both an attorney and a medical doctor. Brown told plaintiff that liability in the underlying suit was clear and the only issue was damages. Trial was originally set for January 2007 but was continued to September and then October 2007.

Plaintiff's complaint alleges that Brown did not mention, to plaintiff or to Zerah, that his license to practice law had been suspended by the State Bar on two occasions, which prevented him from practicing law for most of two years. What Brown did tell plaintiff is that he had handled thousands of cases, was an experienced trial attorney, had until recently been a member of a two-attorney partnership but his partner had dissolved the partnership, and Brown had only a legal secretary helping him. Brown told plaintiff that the underlying case was operating under a contingency fee agreement whereby Brown would receive 40 percent of Zerah's verdict or settlement and Zerah would cover the costs of the suit once the settlement or verdict was obtained.

Plaintiff alleges in his complaint that Brown represented to him that the case had been properly prepared to that point, including the retention and payment of experts. In addition, Brown stated that the experts had been prepared for their depositions and provided with the relevant information experts normally require, and that all other relevant discovery had been completed. Based on those assurances, plaintiff agreed to associate into the case, and Brown and plaintiff agreed to divide the labor in the case equally, with plaintiff handling the depositions and trial testimony of the medical experts and Brown handling the remainder of the case. Brown and plaintiff agreed that if the case settled for up to $1.5 million, plaintiff would receive

one-half of the fees received by Brown, and plaintiff would receive 25 percent of Brown's fees for any settlement above that amount; and, if the case did not settle, a further agreement would be reached about fee sharing. Prior to making the agreement, Brown repeatedly assured plaintiff that he had obtained Zerah's consent to plaintiff's association as cocounsel in the case and to the fee-sharing agreement. Brown repeatedly assured plaintiff that Zerah had agreed in writing to the fee-sharing agreement, as required by California Rules of Professional Conduct, rule 2-200,[3] and that Brown would forward a copy of that written agreement to plaintiff. However, no copy of such writing was ever sent by Brown. Plaintiff performed his duties on the underlying case while waiting to receive a copy of the writing that Brown represented had been signed by Zerah. When plaintiff met with Zerah to prepare a mediation brief, Zerah indicated that Zerah knew plaintiff was representing him in the underlying case along with Brown, knew plaintiff was doing a substantial amount of work for that case, and approved of the association between Brown and plaintiff.

### 3. *Plaintiff's Efforts in the Underlying Suit*

Plaintiff's complaint alleges that when Brown gave plaintiff the complete file on Zerah's case, plaintiff saw that Brown had made material misrepresentations about the work that had been done on the underlying case up to the point where plaintiff became associated. Brown had not spoken to and deposed the policemen and emergency medical personnel who were at the scene of Zerah's car accident, nor the various doctors who had examined and treated Zerah at the hospital to which he was taken after the accident. None of those persons had found Zerah to have any traumatic brain injuries or short-term amnesia, although Zerah was claiming those damages. By the time plaintiff discovered that those witnesses had not been deposed or even interviewed by Brown, the discovery cutoff date had passed. Moreover, although Brown had designated an accident reconstructionist and a biomechanics expert, when the defendants noticed their depositions, Brown informed plaintiff that he had never actually retained these experts, paid them, nor given them information about the accident on which their opinions could be based. The economist that Brown did retain had not been paid and had not been given any information on which to base an economic analysis, and the only economic information that Brown had presented to the defendants

---

[3] California Rules of Professional Conduct, rule 2-200 (rule 2-200), states in relevant part: "(A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless: [¶] (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and [¶] (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200."

showed that since the accident Zerah had not suffered a diminution in his salary. Other experts designated by Brown (vocational rehabilitation, speech and cognitive therapy, neurologist, psychiatrist) had not been prepared to the point of being ready to be deposed by the defendants, including not being given any of the reports and opinions of the other experts and medical personnel.

Further, according to plaintiff's complaint, Brown eventually confessed that, contrary to his previous representation about how many trials he had handled, he had only handled three or four over the course of 25 years and none of them were the size of Zerah's case. Also, Brown said he could not handle any of the law and motion matters that came up, and so plaintiff had to do them. Brown told plaintiff he did not know how to prepare the various pretrial documents and so plaintiff had to prepare them as well. It was also plaintiff who had to defend the depositions of Zerah's experts. In speaking with the experts, plaintiff discovered each had a different theory of Zerah's damages and none of them knew the findings or opinions of Zerah's other experts, leaving plaintiff to explain the views of each expert to the others to develop a coherent theory of damages.

Plaintiff alleges that he deposed the expert witnesses of the central defendant in the case, Klein. They are experienced neurologists and expert witnesses and they took the position that, because there were no overt signs of harm to Zerah at the time of the accident and when Zerah was examined at the hospital, Zerah did not have a traumatic brain injury from the accident and any dysfunction he claimed was actually psychological and without objective verification. That was a position that, if accepted by a trier of fact, would severely diminish the amount of the damages that Zerah might recover. However, based on plaintiff's preparation for their depositions, plaintiff was able to make the two defense experts concede during their depositions that to a reasonable medical probability, Zerah did sustain traumatic brain injury in the automobile accident, that any psychological problems Zerah had in addition to the traumatic brain injury were caused by that brain injury or by posttraumatic stress related to the accident, and that therefore Zerah's work-related harm was caused by the accident. Plaintiff was also able to persuade Zerah's accountant to divulge that Zerah's seemingly constant salary since the accident was not from profits of the family jewelry business but the result of utilizing the company's reserve and line of credit. With that information, Zerah's expert economist was able to produce a preliminary report on lost past and future earnings.

According to plaintiff's complaint, Brown did not have the capability to prepare a mediation brief and so that task also fell to plaintiff for both the initial and second mediations. Alane settled out of the lawsuit at the initial mediation, a date was set for a second mediation, and the defense attorney opined that a stipulation of liability was likely. Besides doing most of the work in the first seven weeks that plaintiff was involved in Zerah's case (the motions, pretrial documents, mediation briefs, demand letters, and defense or prosecution of all of the expert depositions), it was clear that if the case went to trial, plaintiff would also have to conduct the majority of the trial on Zerah's behalf. Plaintiff made a proposal to Brown concerning fee sharing in the event the case went to trial, and Brown sent an e-mail to plaintiff informing plaintiff that the fee-sharing proposal was not acceptable and that plaintiff's services in the Zerah case were terminated. The dismissal of plaintiff from the underlying case occurred less than a week before the second mediation was to occur.

The complaint alleges Brown characterized the dismissal of plaintiff from the underlying case as a withdrawal by plaintiff from the suit, and later asserted that plaintiff had abandoned the case. Plaintiff responded by sending letters and e-mails to Brown and Zerah saying it would be better for Zerah if plaintiff continued in the case under the agreement that Brown and plaintiff had worked out for fees if the case settled, because that would project a united front of a trial counsel who has a medical degree. Neither Brown nor Zerah responded to plaintiff's communications. Plaintiff then wrote to Brown and Zerah informing them that he would file an attorney's lien on the case for the contract amount of his fees if the case settled and for quantum meruit recovery of attorney's fees if the case had to be tried. The lien was filed and served on Brown, defense counsel and the insurer. The case did not settle at the second mediation, with Klein's offer somewhere in the range of $1.7 to $2 million being rejected. With plaintiff no longer acting in the case, Brown retained another experienced trial attorney to represent Zerah in settlement negotiations, and the case settled for $2 million.

### 4. *Brown Informs Plaintiff that Plaintiff Is Not Entitled to Any Fees*

Plaintiff's complaint alleges Brown then informed plaintiff that plaintiff was not entitled to any portion of the $800,000 in attorney's fees realized from the settlement because Zerah had never signed a rule 2-200 agreement to the division of fees, and because plaintiff had abandoned Zerah's case. Brown wrote to plaintiff telling him that he would file a complaint with the State Bar if plaintiff did not sign off on the settlement check and permit the entire attorney's fees to go to Brown. Plaintiff replied that since his lien only pertained to attorney's fees and not to any portion of Zerah's settlement that

Zerah would keep, the *disputed fees* should be placed in a joint account or escrow pending determination of the fee dispute. The attorney who negotiated the settlement on Zerah's behalf agreed to that proposal, but Brown did not. Brown then filed a false complaint with the State Bar against plaintiff over Zerah's name, resulting in the initiation of an inquiry by the State Bar.[4] Plaintiff alleges Brown filed the State Bar complaint as a means of forcing concessions in the underlying suit, to wit, that plaintiff sign off on the settlement check, and then Brown sent plaintiff an e-mail essentially saying that plaintiff would live to regret having a State Bar complaint filed against him and he should immediately sign the settlement checks. Within 48 hours after the State Bar complaint was filed, Zerah retained new counsel and the new attorneys contacted Brown, plaintiff and Zerah's settlement counsel and asked that the settlement checks be signed off on so that Zerah could receive his award and the dispute over attorney's fees could be handled later in litigation. Plaintiff and Zerah's settlement counsel agreed to place the disputed attorney's fees in escrow or a dual account to enable Zerah to collect his award, but Brown refused. The result was that Zerah's new attorneys filed suit against Brown (but not against plaintiff) on behalf of Zerah.[5] The State

---

[4] Neither Brown nor plaintiff included a copy of the State Bar complaint in their section 425.16 papers. However, the appellate record contains a copy of a letter sent to plaintiff by the State Bar, dated November 5, 2007, wherein the State Bar stated that Zerah made the following allegations in his State Bar complaint: plaintiff violated rule 2-200 by not signing a fee agreement with Zerah, and by placing a lien on the case; plaintiff abandoned Zerah's case two weeks before trial when plaintiff's request for additional fees was denied; plaintiff did not provide Zerah with a detailed billing statement for services plaintiff provided to Zerah; plaintiff violated the attorney-client privilege by sending letters to defense counsel and an insurance carrier in the underlying case revealing confidential information about the case (the lien); plaintiff continues to assert an invalid lien against Zerah's settlement funds; and plaintiff has claimed an entitlement to "the unconscionable amount of $800,000" in fees "which is not supported by the work that [plaintiff] may have performed on this matter."

[5] A copy of the complaint in the Zerah v. Brown case, which bears a preparation date of January 18, 2008, shows that Brown was sued for breach of fiduciary duty, conversion, breach of written contract, and unfair competition for failing to deposit the settlement check into a client's trust account and failing to pay to Zerah the undisputed amount of money due Zerah from the settlement check and place the disputed attorney's fees in an escrow or blocked account.

The appellate record contains a copy of a letter from plaintiff to the attorneys who represent Zerah in his suit against Brown. The letter is dated November 15, 2007. It states plaintiff's recognition that the impasse regarding the attorney's fees "could go on for months," that plaintiff did not want to "put [Zerah] through that," and that plaintiff was therefore abandoning his lien and authorizing Zerah's attorneys to sign plaintiff's name to the settlement check.

Additionally, there is a copy of a letter from Zerah to the State Bar, dated November 19, 2007, wherein Zerah indicated he was writing to withdraw his complaint against plaintiff. Zerah's letter states in part: "I now believe that I may have been misguided by my prior counsel, Michael Brown, Esq., in filing my complaint against Mr. Cohen." Zerah then stated he was aware that (1) plaintiff was working on the underlying case, (2) plaintiff would be paid for his work on that case, and (3) plaintiff's association into that case would not increase Zerah's

Bar's review of the response that plaintiff made to the State Bar complaint remained pending as of November 9, 2007, the date the instant case was filed.

### 5. Plaintiff's Causes of Action Against Brown

Plaintiff alleged causes of action for (1) intentional misrepresentation amounting to fraud; (2) breach of express and implied contracts and quantum meruit; (3) conversion; (4) extortion by means of filing a knowingly false State Bar complaint against plaintiff in violation of Business and Professions Code section 6043.5; (5) unfair competition; (6) unjust enrichment; and (7) intentional infliction of emotional distress.

### 6. Brown's Special Motion to Strike the Complaint

Brown filed a section 425.16 special motion to strike the complaint, which plaintiff opposed. Brown contended that the instant suit is a retaliation by plaintiff to Brown's having (1) assisted Zerah in filing a complaint with the State Bar and (2) successfully represented Zerah in the underlying suit and collected a fee for his legal services. Brown asserted that the assistance he provided to Zerah in connection with the State Bar complaint comes within the parameters of section 425.16's protection. Brown also asserted his actions come within the parameters of Business and Professions Code section 6094's protection for communications concerning an attorney's competence or misconduct, and within the litigation privilege in Civil Code section 47.[6] Brown contended plaintiff's first through third causes of action (fraud, breach of express and implied contracts, and conversion), and the sixth and seventh causes of action (unjust enrichment and intentional infliction of emotional distress) all arise from Brown's protected activity of facilitating Zerah's State

---

legal fees. Zerah also stated he approved of plaintiff serving as his attorney, and that Brown never asked him to sign a consent to a fee-sharing arrangement.

[6] Plaintiff erroneously asserts in this appeal that Brown did not claim protection under Business and Professions Code section 6094 and Civil Code section 47 when he made his special motion to strike. Business and Professions Code section 6094 states in relevant part: "Communications to the disciplinary agency relating to lawyer misconduct or disability or competence, or any communication related to an investigation or proceeding and testimony given in the proceeding are privileged, and no lawsuit predicated thereon may be instituted against any person." (Bus. & Prof. Code, § 6094, subd. (a).) Brown asserts that each of plaintiff's seven causes of action is based on the State Bar complaint that Brown filed over Zerah's name and thus each is precluded by section 6094.

Civil Code section 47 states in relevant part: "A privileged publication or broadcast is one made: [¶] . . . [¶]

"(b) In any . . . (2) judicial proceeding . . . ." (Civ. Code, § 47, subd. (b).) Brown asserts the State Bar complaint is privileged because it was made in the underlying action, and thus section 47 also precludes plaintiff's causes of action.

Bar complaint, and plaintiff has simply attempted to characterize those causes of action as "garden variety" claims. He contended the fourth and fifth causes of action (extortion and unfair competition) also arise from his protected activity.

In his declaration filed in support of his special motion to strike plaintiff's complaint, Brown presented his own version of what transpired in the underlying action around the issue of attorney's fees. He stated that when he and plaintiff arranged for a division of attorney's fees it was for fees covering the entire case, not just up through settlement, and it was plaintiff's obligation to obtain the written rule 2-200 consent from Zerah. He asserted that their agreement was for plaintiff to receive "15% of 75% of the first $1.5 million of attorney's fees and 25% of 75% of fees above that." He further stated that on September 19, 2007, a week before mediation (apparently the second mediation), plaintiff attempted to change that division of fees agreement in the event the case did not settle, and then the next day plaintiff abandoned the underlying case.[7] Brown also claimed that on September 21, 2007, Zerah

---

[7] Plaintiff sent correspondence to Brown wherein plaintiff, among other things, chided Brown about the status of the underlying case insofar as matters which should have already been done by Brown were not done, and the fact that it was plaintiff who had been doing much of the work on the case. Plaintiff stated: "If the case settles, I'll leave things as they are, because I agreed to it, though I really feel that with a thousand cases under your belt, you should have done a lot of the work that I've wound up picking up. If the case has to go to trial, we have to share the outcome equally." Plaintiff also stated: "I'll continue to do my best to get the case resolved, . . . I feel we've [(apparently meaning plaintiff and his law firm)] had to do everything except appear in ex partes, and that is not what I would have expected when we made our agreement."

Brown sent plaintiff a reply e-mail that same day in which he stated he had feelings about plaintiff's work but had kept them to himself, and he disagreed that he had mishandled the case "or failed to do all that was reasonably within my power to position it for settlement or trial, and I am shocked that you would try to renegotiate our agreement at this stage . . . . You knew damn well what the situation was when we struck our deal."

Plaintiff replied the following day, September 20, 2007, again setting out many things which he believed should have already been done by Brown both prior to, and after, plaintiff came into the case. He stated that perhaps it was "time for you to take back the case, pay me in the end an hourly fee for my work, and finish it up yourself. My understanding at the start was that you had handled many such cases, were experienced in dealing with them, and needed some help with the medical witnesses. That was the basis for an agreement that essentially had me getting 15% of 75% of the fees on the first 1.5 million and 25% of 75% on fees above that." Plaintiff also stated: "Normally when a more experienced trial attorney comes into a case only for trial, the deal is 50% of the fees." He added: "I did not sign up to take on a major case, rebuild it from scratch with little assistance except for the payment of costs, in the last two months before trial, and then try it. If that had been the offer, I would have rejected it at the outset. . . . [¶] . . . I agreed to a fairly minimal % mostly because I figured you were in need, with you and your partner having split up, and because I felt there was a good chance of settlement and that you had done or would do your share of the work. . . . If it goes to trial, . . . either we will have to make an arrangement typical for this work, or frankly, just try the damn thing yourself, pay me for the time I've put in, and let's get done with it. [¶] It may be that the

contacted Brown and related that plaintiff had told him that he would not remain in the case if he did not receive 50 percent of the attorney's fees. On that same day, Brown e-mailed plaintiff and told him the offer to renegotiate the terms of their agreement was not acceptable and therefore "your services are at an end."[8]

Brown asserted that when the case settled for $2 million, he agreed to place $105,000 in an escrow account which, Brown claimed, was the most money to which plaintiff was entitled under their agreement, but plaintiff unreasonably had demanded that all of the attorney's fees be placed in an escrow account by Brown before he (plaintiff) would endorse the settlement check. Brown stated that he had assisted Zerah, at his request, in filing a complaint with the State Bar on October 9, 2007, and then after the underlying suit settled, a State Bar attorney asked that a second complaint be filed with the State Bar because plaintiff had asserted an illegal lien and refused to endorse the settlement check.

Plaintiff submitted a declaration in support of his opposition to Brown's special motion to strike. The statements in the declaration were essentially similar to the allegations in plaintiff's complaint. Plaintiff's law partner submitted a declaration wherein he stated that Brown had told him that if he (the law partner) did not sign off on Zerah's settlement check, there would be trouble with the Bar, plaintiff could lose his license to practice law and so could the law partner. A few days later plaintiff received a letter from the State Bar concerning the complaint that Zerah filed against plaintiff.

In his reply to plaintiff's opposition, Brown reiterated his original arguments. In addition, he asserted that the Supreme Court's decision in *Flatley v. Mauro* (2006) 39 Cal.4th 299 [46 Cal.Rptr.3d 606, 139 P.3d 2] (*Flatley*), wherein the court held that section 425.16 protection is not applicable to actions taken by a defendant that are illegal as a matter of law, is not applicable here because assisting Zerah to make a complaint to the State Bar was not extortion, and in fact it was plaintiff who was attempting extortion by insisting that all of the attorney's fees be placed into a special account whereas Brown agreed to put $105,000 into such an account because that sum is the most to which plaintiff would have been entitled under their agreement.

---

best thing to do is for you to take the case back, get a continuance, pay me for my time, and associate someone else in for trial."

[8] Plaintiff replied on that same day, September 21, 2007, that he was willing to work with Brown through the upcoming second mediation "to get the best possible settlement for [Zerah]" and after that if the association was over then plaintiff would work with Brown to obtain a continuance of the trial.

### 7. The Trial Court's Ruling

The trial court denied Brown's special motion to strike the complaint, stating that the filing of the State Bar complaint was in furtherance of Brown's goal of obtaining an advantage in a fee dispute with plaintiff. It was therefore filed in an "extortive context" and not in furtherance of a right of petition. As a matter of law, it was illegal and not a protected activity. The court cited *Flatley, supra,* 39 Cal.4th 299, and a November 3, 2007 e-mail wherein Brown told plaintiff that Zerah had filed a complaint with the State Bar and the only way to avoid disciplinary action by the State Bar was to immediately agree to endorse the settlement checks without condition.

The trial court further stated in its ruling that even if it were to consider the filing of the State Bar complaint protected activity, the special motion to strike would be denied because plaintiff presented facts that demonstrate a probability of prevailing on the complaint. The court denied plaintiff's request for attorney's fees, saying it did not believe that Brown's special motion to strike had been brought in bad faith.

### DISCUSSION

### 1. Standard of Review

We use our independent judgment in reviewing Brown's special motion to strike, and thus examine the motion under the same process as trial courts do. The trial court first determines "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).)" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*).) " 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) If the defendant meets that burden, the burden shifts to the plaintiff to demonstrate a probability that it will prevail on that cause of action. (§ 425.16, subd. (b)(1).)

Both the defendant moving party and the plaintiff must make a prima facie showing with respect to their respective section 425.16, subdivision (b)(1)

burdens. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646 [49 Cal.Rptr.2d 620], disapproved on another point in *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5.) In analyzing these shifting burdens, we "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not determine credibility nor weigh the evidence presented by the parties. The evidence favorable to the plaintiff is accepted as true, and the defendant's evidence is evaluated to determine if it defeats plaintiff's evidence as a matter of law. (*Flatley, supra,* 39 Cal.4th at p. 326.)

■ However, merely showing that the plaintiff filed its complaint *after* the defendant engaged in protected activity is not sufficient because it does not demonstrate that the activity on which the plaintiff's cause of action is based was itself an act of the defendant taken in furtherance of the defendant's right of petition or free speech in connection with a public issue. (*Equilon, supra,* 29 Cal.4th at p. 66.) Section 425.16, subdivision (b) addresses causes of action against a defendant that *arise from* the constitutionally protected activities of the defendant, not that simply follow in time those activities. Moreover, because a cause of action that *arises from* a defendant's protected actions is synonymous with a cause of action that is *based on* the defendant's protected actions, "[t]he anti-SLAPP statute cannot be read to mean that 'any claim asserted in an action which arguably was filed in retaliation for the exercise of speech or petition rights falls under section 425.16, whether or not the claim is *based on* conduct in exercise of those rights.' [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 77 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Thus, "arising from" does not equate with "in response to." (*Ibid.*) "That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such." (*Id.* at p. 78.)

### 2. *Applicability of Section 425.16 to a Defendant's Illegal Actions*

As noted above, Brown asserts that plaintiff's causes of action arise from protected activity associated with the underlying lawsuit, to wit, Brown's assisting Zerah in filing the State Bar complaint. He contends that all seven of the causes of action in plaintiff's complaint are based on the filing of the State Bar complaint and therefore his special motion to strike the complaint should be granted. Specifically, Brown asserts that the fourth cause of action for extortion and the fifth cause of action for unfair competition are based entirely on the filing of the State Bar complaint, and the other five causes of action are "garden variety tort claims" that are also based on the State Bar complaint. Brown asserts that in these other five causes of action, plaintiff has combined allegations of protected and nonprotected activity so as to avoid the effect of section 425.16.

 Subdivision (a) of section 425.16 specifically states that section 425.16 is concerned with suits that "chill the *valid* exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Italics added.) In *Flatley*, the Supreme Court concluded that when a defendant's speech or petition activity upon which the defendant relies to support a section 425.16 special motion to strike is conceded or shown to be illegal as a matter of law, such speech or petition activity will not support the special motion to strike. (*Flatley, supra,* 39 Cal.4th at p. 320.) That conclusion is applicable in this case.

 It is well settled that extortion is not constitutionally protected speech and thus cannot constitute the "valid" exercise of speech and petition that is protected by section 425.16. (*Flatley, supra,* 39 Cal.4th at p. 328.) In *Flatley*, the court, after discussing the character of the crime of extortion, observed that "[a]ttorneys are not exempt from these principles in their professional conduct" and cited rule 5-100 of the California Rules of Professional Conduct. (39 Cal.4th at pp. 326–327.) Rule 5-100 states in relevant part: "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."

 Here, Brown went a step further than merely threatening to present administrative charges. He actually did present an administrative charge to the State Bar, through Zerah, and the communications he had with plaintiff and plaintiff's law partner demonstrate that the purpose of filing the State Bar complaint was to gain an advantage in the underlying action by pressuring plaintiff and his law partner into immediately signing off on the settlement check. In an e-mail, Brown insisted that the State Bar would essentially make plaintiff's life a living hell unless plaintiff demonstrated good faith to the State Bar by immediately signing off on the settlement check.[9] Brown's assertion in support of his section 425.16 motion that the State Bar complaint

_____

[9] Brown's e-mail to plaintiff is dated November 3, 2007. It states in relevant part: "Mr. Zerah has filed a complaint with the State Bar. . . . They have already sent you a formal inquiry and you will be required to respond as to why you are withholding your endorsement in violation of Rule 2-200. . . . *If you respond to this e-mail that you will immediately endorse the settlement checks without condition, you can respond to their inquiry that way. If you continue to refuse, they will immediately institute disciplinary proceedings against you, and possibly [your law partner]. I suggest you advise him of that.* [¶] *You may think that if they institute formal proceedings that you will be able to cure the violation by giving in and signing the checks later on, but you would be wrong. The State Bar is unrelenting and uses administrative procedures which violate your usual standards of due process. In addition, they will investigate Mr. Zerah's complaints of abandonment, and disclosure of confidential attorney-client information. Like criminal prosecutors, they will look at everything you have done to see if there are other violations and then bring additional charges against you. Trust me, for you it is a lose-lose situation.* [¶] *Your alternative is to immediately sign, or authorize me to endorse your firm name to the checks, and then address the attorney fees issue thereafter.*" (Italics added.)

was about Zerah receiving his share of the settlement funds and not about Brown receiving attorney's fees is inconsistent with the evidence that Brown repeatedly rejected proposals, made by both plaintiff and by the other attorneys who represented Zerah after plaintiff left the underlying case, to either have the attorney's fees placed in a joint or escrow account, or have the settlement be made in two checks (one for Zerah's portion of the settlement funds and the other for the attorney's fees) so that Zerah could timely receive his share of the funds from the settlement of his case.

■ The record before us supports the trial court's conclusion that Brown's actions with respect to the filing of the State Bar complaint constitute extortion. The *Flatley* court noted that (1) the threat made by an extortionist does not have to succeed in producing an exchange of money in order to constitute extortion; (2) the action that is threatened unless money is paid may itself not be an illegal action but instead, it is the coupling of the threat of that action with the demand for money that constitutes the illegality; and (3) it is immaterial to the crime of extortion that the purpose of the threat is to collect money justly due the extortionist. (*Flatley, supra*, 39 Cal.4th at pp. 326–327.)

Thus, the "assistance" given to Zerah by Brown in filing the State Bar complaint will not insulate Brown and sustain Brown's special motion to strike plaintiff's complaint because plaintiff's evidence supports the trial court's conclusion that such assistance constituted an act of extortion under Penal Code section 518 et seq., and was therefore unlawful.[10] Having determined that Brown's stated basis for relief under section 425.16 is not viable, we need not reach the question as to whether plaintiff has made a prima facie showing that he can prevail on any of his various causes of action.

3. *The Interaction Between Section 425.16, Civil Code Section 47's Litigation Privilege, and Business and Professions Code Section 6094, Subdivision (a)*

■ *Flatley* is instructive on another issue in the instant case. The defendant in *Flatley* argued that the speech and petition protection in section 425.16 is coextensive with the litigation privilege in Civil Code section 47

---

[10] In a petition for rehearing, Brown argued that this court should modify its opinion to state that the plaintiff is precluded from contending in any subsequent proceedings following remand, including trial, that our affirmance of the trial court's said conclusion is the law of the case. We decline to do so. Any attempt by this court to resolve an issue that has not yet been raised, and which would necessarily depend upon the finality of this decision, would be premature and advisory. The resolution of any law of the case issue that may be raised by the plaintiff should be left to the initial consideration of the trial court. (See generally, 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 470–472, pp. 528–531.)

(fn. 6, *ante*), and therefore illegal activity that is within the protection of the section 47 litigation privilege is also protected by section 425.16. The Supreme Court in *Flatley* rejected the argument. The court observed that the purpose of section 47 is to provide litigants, witnesses and attorneys with freedom of communication in judicial proceedings and freedom from subsequent derivative tort actions that arise from communications in such proceedings. (*Flatley, supra*, 39 Cal.4th at pp. 321–322.) Although the court acknowledged that the section 47 litigation privilege applies to fraudulent communications and perjured testimony (and is an absolute privilege barring all tort causes of action except malicious prosecution), and although the court assumed arguendo that such privilege would apply to extortion, the *Flatley* court held *extortion threats are not protected under section 425.16* because "the litigation privilege and the anti-SLAPP statute are substantively different statutes that serve quite different purposes, and it is not consistent with the language or the purpose of the anti-SLAPP statute to protect such threats." (*Flatley, supra*, 39 Cal.4th at p. 322; see *id.* at pp. 323–325.)

However, *Flatley* noted that the litigation privilege is relevant to the *second* step in a court's analysis of a section 425.16 special motion to strike in that the litigation privilege may prevent a plaintiff from demonstrating that it can prevail on a cause of action. (*Flatley, supra*, 39 Cal.4th at p. 323.) Thus, when a defendant *can* meet its section 425.16 burden of establishing a prima facie case that a cause of action arises from the defendant's valid speech or petition activity, the special motion to strike that cause of action will succeed when the defendant also shows that the defense of the litigation privilege prevents the plaintiff from demonstrating a probability of prevailing on the cause of action. (39 Cal.4th at p. 323.) The same can be said with respect to the protection provided by Business and Professions Code section 6094, subdivision (a) (fn. 6, *ante*). Here, Brown has claimed that both Civil Code section 47 and Business and Professions Code section 6094 protect him from plaintiff's claims. As we have explained, however, that is not an issue in this case because the burden never shifted to plaintiff to demonstrate a probability of prevailing on his causes of action.

### 4. Causes of Action for Recovery of Fees, Governing Case Law Respecting Rule 2-200

Lastly, we address Brown's contention that *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536, 56 P.3d 645] (*Chambers*) prohibits recovery in a breach of contract suit for fees filed by an attorney against another attorney when there is no compliance with rule 2-200. In *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453 [9 Cal.Rptr.3d 693, 84 P.3d 379] (*Huskinson*), the court restated its holding in *Chambers* that where there has been no compliance with rule 2-200's requirement of a client's written consent to a division of attorney's fees, an attorney cannot recover under an

agreement with another attorney to divide contingent fees that are generated by the successful prosecution of the client's case. (*Huskinson*, at p. 457.) *Huskinson*, however, also addressed the question of whether the plaintiff attorney could succeed under another theory of recovery. The court held that in a proper case recovery in quantum meruit is permitted because, while rule 2-200 addresses the *division* of fees that the client paid or agreed to pay, recovery in quantum meruit is based on the reasonable value of services. Therefore it is not a division of fees. The court emphasized that recovery in quantum meruit would not increase the amount of attorney's fees paid or owed by the client. (*Huskinson*, at pp. 456, 458–459.)

■ The *Huskinson* court reasoned that recovery in quantum meruit is not based on contract but rather on the existence of circumstances where services were rendered and both parties understood or expected that compensation for the services would be made. (*Huskinson, supra*, 32 Cal.4th at p. 458.) The court observed that recovery in quantum meruit is permitted in other circumstances where an attorney's compensation agreement is unenforceable because, for example, it was a contingent fee agreement but was not signed by the client, or the legal expenses were reasonably expected to be more than $1,000 but there was no written agreement, or the client was represented in a dissolution of marriage case under a contingent fee agreement. (*Id.* at pp. 460–462.) An attorney who labors under an unenforceable agreement "nonetheless deserves reasonable compensation for [his or her] services." (*Id.* at p. 460.)

■ We also note that rule 2-200 requires only that the client's consent to a division of fees be given prior to the actual *division* of the fees. It does not require client consent prior to the commencement of work by the associated-in attorney/law firm. (*Mink v. Maccabee* (2004) 121 Cal.App.4th 835, 838 [17 Cal.Rptr.3d 486].) Thus, in this case, it is still possible to fulfill the requirements of rule 2-200. In the letter that Zerah wrote to the California State Bar, wherein Zerah indicated he was writing to withdraw his complaint against plaintiff, Zerah stated he was aware that (1) plaintiff was working on the underlying case, (2) plaintiff would be paid for his work on that case, and (3) plaintiff's association into that case would not increase Zerah's legal fees. Zerah also stated he approved of plaintiff's serving as his attorney, and Brown had never asked him to sign a consent to a fee-sharing arrangement. This letter is insufficient in one respect to satisfy rule 2-200. It does not contain the *terms* of the fee division agreement under which plaintiff agreed to associate in as counsel in the underlying case. However, because it does not appear from the record that acquisition by plaintiff of a written consent signed by Zerah which spells out the terms of the fee-sharing agreement is foreclosed, plaintiff's ability to recover under that agreement appears to remain possible.

## DISPOSITION

The order from which Brown has appealed is affirmed. Costs on appeal to plaintiff.

Klein, P. J., and Aldrich, J., concurred.

A petition for a rehearing was denied May 22, 2009, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied July 8, 2009, S173369.