Filed 6/13/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| JEROME STENEHJEM, <br><br>     Plaintiff, Cross-defendant and Respondent, <br><br>         v. <br><br> SURYA SAREEN, <br><br>     Defendant, Cross-complainant and Appellant. | H038342 <br> (Santa Clara County <br> Super. Ct. No. 111CV209402) |


A SLAPP suit is one in which the plaintiff "seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. [Citation.]" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055.)[1] The California Legislature in 1992 enacted Code of Civil Procedure section 425.16—the anti-SLAPP statute—under which SLAPP suits may be disposed of summarily by a special motion to strike.[2] But if the "assertedly protected speech or petitioning activity [is] illegal as a matter of law, . . . [defendant] cannot use the anti-SLAPP statute to strike the plaintiff's complaint." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 305 (*Flatley*).) In

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2] Further statutory references are to the Code of Civil Procedure unless otherwise stated.

*Flatley*, our high court held that a defendant's (attorney Mauro's) prelitigation demand—which he characterized in his appeal from an order denying his special motion to strike as "permissible settlement negotiations" (*id.* at pp. 328)—was extortion as a matter of law and therefore not protected activity under the anti-SLAPP law. In this case, we must determine whether a cross-defendant's prelitigation demand (like Mauro's in *Flatley*) was extortion. If so, the special motion to strike that was based upon that demand should have been denied.

Jerome Stenehjem sued his former employer, Akon, Inc., and Surya Sareen, Akon's president and chief executive officer, for defamation, among other causes of action. Sareen countersued for civil extortion. Sareen alleged in an amended cross-complaint (Cross-Complaint) that Stenehjem (1) had asserted, through his counsel, a prelitigation claim for defamation; and (2) had later, while representing himself, made a written threat by e-mail to file a false criminal complaint against Sareen unless he paid Stenehjem monies to settle his defamation claim. Stenehjem's e-mail demand mentioned a potential qui tam suit; alluded to accounting documents created by Stenehjem at Sareen's specific direction, and referred to potential involvement of the United States Attorney General, Department of Justice, and Department of Defense. Sareen alleged that Stenehjem's demand constituted extortion in violation of criminal laws.

Stenehjem moved to strike the Cross-Complaint. He contended that (1) the Cross-Complaint was based upon prelitigation communications that were protected statements under the anti-SLAPP statute (§ 425.16, subd. (e)(2)); and (2) Sareen could not establish a probability of prevailing because Stenehjem's communications were subject to the litigation privilege of Civil Code section 47, subdivision (b). The court granted Stenehjem's motion, dismissing the Cross-Complaint.

Sareen appeals the order of dismissal. He contends the special motion to strike should have been denied because Stenehjem's threat constituted extortion that was not protected speech under the anti-SLAPP statute. Sareen argues further that even if

2

Stenehjem had made an initial showing that his activity was protected, Sareen met his burden of demonstrating a probability of success on his claim.

We conclude after a de novo review of the record that the conduct underlying the Cross-Complaint—Stenehjem's prelitigation e-mail demand, when considered in the context in which the demand was made—constituted extortion as a matter of law that was not protected under the anti-SLAPP statute. Accordingly, we will reverse the order granting the motion to strike the Cross-Complaint.

PROCEDURAL HISTORY

I.     *The Complaint*

Stenehjem filed suit on or about September 19, 2011. He filed the unverified First Amended Complaint (Complaint) on October 28, 2011, against Akon and Sareen (collectively, Defendants). Stenehjem alleged six causes of action against Defendants: defamation; unlawful prevention of employment by misrepresentation (Lab. Code, § 1050); employment discrimination under the Fair Employment and Housing Act (FEHA); wrongful termination in violation of public policy; intentional infliction of emotional distress; and breach of the implied covenant of good faith and fair dealing.[3]

With respect to the Complaint's defamation claim, Stenehjem alleged that beginning on or about January 20, 2011, "Defendants began to publicly, falsely and maliciously state [to Akon employees and others] that [Stenehjem] had physically assaulted and battered a petite female coworker during a discussion about her violations

---

[3] Akon and Sareen filed separate demurrers to the Complaint. The court sustained Akon's demurrer with leave to amend as to the second and third causes of action, but otherwise overruled the demurrer. It sustained Sareen's demurrer with leave to amend as to the second, fourth, fifth, and sixth causes of action; sustained his demurrer without leave to amend as to the third cause of action; and overruled the demurrer as to the first cause of action. The record does not reflect whether Stenehjem further amended the Complaint.

of company policies." The second claim under Labor Code section 1050 was based upon the allegation that Defendants "blacklisted [Stenehjem]" by uttering the defamatory statements. Stenehjem alleged as a FEHA discrimination claim that he had been "terminated on false pretenses because of his sex/gender and race/national origin after being falsely accused of assault and battery," and that "Defendants gave preferential treatment to workers of South Asian and East Asian descent and origin." The fourth cause of action for wrongful termination was based upon the assertions that (1) Defendants had "engaged in illegal tax and duty evasion, fraud, and submitting of false records to the government"; (2) Stenehjem had protested the conduct; and (3) his termination "was motivated by his opposition to [Defendants'] illegal practices." The fifth cause of action for intentional infliction of emotional distress was based upon alleged defamation and wrongful termination. Finally, Stenehjem alleged that Defendants terminated his employment without good cause and in violation of the covenant of good faith and fair dealing implied in his employment contract.

II. *The Cross-Complaint*

On January 25, 2012, Sareen filed the Cross-Complaint against Stenehjem.[4] Sareen alleged that after Stenehjem's at-will employment with Akon was terminated in January 2011, Stenehjem had claimed that Akon had defamed him in that Sareen had "stated to other AKON employees that Stenehjem had been terminated because he had physically assaulted and battered a female co-employee." Stenehjem hired an attorney who sought to engage in settlement negotiations with counsel for Akon and Sareen, but counsel for Akon and Sareen "refused to engage in any settlement discussions or to offer or pay any settlement." Sareen alleged further that Stenehjem then terminated his

---

[4] Sareen filed his initial cross-complaint on November 29, 2011. Stenehjem filed a demurrer to that pleading, which was rendered moot by Sareen's filing of the amended Cross-Complaint.

4

counsel, and on August 5, 2011—while representing himself—wrote to Sareen's counsel, John McDonnell, "and threatened to file a false criminal complaint against [Sareen] if [Sareen] did not pay monies to Stenehjem. Stenehjem stated he would claim that [Sareen] had engaged in false billing practices with the federal government and had defrauded the federal government in violation of federal criminal statutes." Sareen alleged that Stenehjem's communication constituted extortion and abuse of process.

III.     *The Special Motion to Strike*

On February 24, 2012, Stenehjem filed a special motion to strike the Cross-Complaint under the anti-SLAPP statute. Sareen opposed the motion, and Stenehjem submitted a reply. The motion was heard on March 22, 2012, and was granted by the court on March 28, 2012.[5] The court found that (1) Stenehjem had met his threshold burden of showing that the Cross-Complaint arose from activities that were protected under section 425.16, subdivision (e)(2), in that they were communications in anticipation of litigation; and (2) Sareen had not established a probability that he would prevail on the Cross-Complaint.[6]DISCUSSION

I.     *Anti-SLAPP Motions to Strike*[7]

SLAPP suits may be disposed of summarily by a special motion to strike under section 425.16, commonly known as an "anti-SLAPP motion," which is "a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like

---

[5] Sareen elected not to have a reporter's transcript of the hearing prepared.

[6] The court also denied Sareen's request for additional time to conduct discovery and found that Stenehjem was the prevailing party entitled to recover his costs and fees under section 425.16, subdivision (c).

[7] Claims based upon protected activity that may be subject to anti-SLAPP motions to strike may be asserted in cross-complaints as well as complaints. (See *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1373.) Since in this instance we are dealing with a cross-complaint, we will liberally substitute the nomenclature for cross-complaints in place of complaints to promote clarity.

5

procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.) The statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff [or cross-complainant] will prevail on the claim." (§ 425.16, subd. (b)(1).) The Legislature has directed that the language of the statute be "construed broadly." (§ 425.16, subd. (a).)

Subdivision (e) of section 425.16 identifies four general categories of activities that constitute protected " 'act[s] in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' "[8] The anti-SLAPP motion here concerns statements that Stenehjem claims are protected under subdivision (e)(2), namely, "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(2).) Such communications that are preparatory to or in anticipation of litigation are protected under section 425.16, subdivision (e)(2), even though they occur before litigation is actually pending. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 (*Briggs*); see also *Neville v. Chudacoff* (2008)

---

[8] "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

6

160 Cal.App.4th 1255, 1268; cf. *Sylmar Air Conditioning v. Pueblo Contracting* (2004) 122 Cal.App.4th 1049, 1058 [litigation privilege under Civ. Code, § 47 applies to "prelitigation communications involving the subject matter of the ultimate litigation"].)[9]

A motion to strike under section 425.16 is analyzed and resolved by "the court . . . engag[ing] in a two-step process. First, the court decides whether the [cross-]defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving [cross-]defendant's burden is to demonstrate that the act or acts of which the [cross-complainant] complains were taken 'in furtherance of the [cross-defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the [cross-complainant] has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) Thus, "[o]nly a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. We consider 'the pleadings, and supporting and opposing affidavits upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the [cross-complainant] [citation] and evaluate the

---

[9] Conduct or speech that is potentially subject to anti-SLAPP protection under clauses (1) and (2) of section 425.16, subdivision (e)—unlike clauses (3) and (4)—do not have a limitation that the speech or petitioning rights concern an issue of public interest. (*Briggs*, *supra*, 19 Cal.4th at p. 1117.)

[cross-]defendant's evidence only to determine if it has defeated that submitted by the [cross-complainant] as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) In performing our de novo review, we " 'conduct[] an independent review of the entire record. [Citations.]' [Citation.] [¶] Thus, our review is conducted in the same manner as the trial court in considering an anti-SLAPP motion. In determining whether the [cross-]defendant . . . has met its initial burden of establishing that the [cross-complainant's] . . . action arises from protected activity, we consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2); [citations].) The second prong—i.e., whether the [cross-complainant] . . . has shown a probability of prevailing on the merits—is considered under a standard similar to that employed in determining nonsuit, directed verdict or summary judgment motions. [Citation.] '[I]n order to establish the requisite probability of prevailing [citation], the [cross-complainant] need only have " 'stated and substantiated a legally sufficient claim.' " [Citations.]' " (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672-673 (*Paulus*).)

II.     *Stenehjem's Motion to Strike and Sareen's Opposition*

Stenehjem argued in his motion to strike that his August 5, 2011 e-mail to McDonnell (sometimes referred to as the August e-mail; see fn. 12, *post*) that was the basis for Sareen's Cross-Complaint constituted protected activity within the meaning of the anti-SLAPP statute. He claimed that the e-mail constituted "pre-litigation settlement communications [falling] squarely within the bright-line ambit of clause (2) of Section 425.16[, subdivision] (e), i.e., any statements made in connection with an issue under consideration or review by a judicial body." Stenehjem argued further that Sareen could not establish a probability of prevailing on his claim because the August e-mail was absolutely privileged under Civil Code section 47, the litigation privilege. The only evidence submitted by Stenehjem in support of the anti-SLAPP motion was the declaration of his counsel. In that declaration, Stenehjem's counsel attached a copy of

8

the August e-mail and indicated the amount of attorney fees incurred in presenting the motion.

In opposing the motion to strike, Sareen argued, among other things, that Stenehjem's e-mail was not privileged, constituted "a threat to accuse Sareen of a crime against the government," and was in fact "pure extortion" that was not protected under the anti-SLAPP statute. Sareen argued that under *Flatley*, *supra*, 39 Cal.4th 290, a demand constituting extortion is not protected under section 425.16, because the anti-SLAPP statute protects only "the valid exercise of constitutional rights of free speech and petition from the abuse of the judicial process." (*Flatley*, at p. 324.) Sareen contended that the August e-mail was not protected by the litigation privilege because it—as a threat to accuse him of a federal crime—did not have a connection or logical relation to Stenehjem's defamation and wrongful termination claims, and was not made to achieve the objects of that civil litigation. (See *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.)

Sareen's opposition included the declaration of his counsel, McDonnell, in which McDonnell detailed the relevant events leading up to his receipt of Stenehjem's August e-mail. McDonnell declared[10] that on February 7, 2011—18 days after Stenehjem's termination by Akon—McDonnell spoke with Stenehjem's then-attorney, Rutger Heymann, in which Heymann "outlined the facts that he claimed supported Stenehjem's defamation claim." Heymann "suggested that damages would be at least $2 million," comprised of $382,000 for lost wages, general damages of approximately $750,000, and punitive damages of $1.25 million. Heymann indicated that his client's " 'pre-litigation' settlement [demand was] $675,000." McDonnell and Heymann spoke again on February

---

[10] To avoid redundancy in this paragraph and the succeeding three paragraphs where we describe the information contained in McDonnell's declaration, we will limit use of the phrase "McDonnell declared."

9

17, 2011.  At that time, McDonnell advised Heymann that "Stenehjem's case was meritless[;] . . . there was a long line of female AKON employees waiting to testify about Stenehjem's foul and abusive (and racist) statements and conduct[;] . . . the only way that Stenehjem would get any money from AKON would be to get a judgment[; and] . . . if he wished to waste two years pursuing Stenehjem's bogus case, he was welcome to do so."

McDonnell declared further that on March 25, 2011, Heymann wrote to him, reiterating the merits of Stenehjem's case and stating "that whatever [Akon's management may] think of Stenehjem personally, defamation is still defamation and wrongful termination is still wrongful termination."  Heymann proposed that the parties "mediate this matter" prior to commencement of litigation.  McDonnell told Heymann "that AKON did not wish to mediate the case, and did not wish to waste any more time on pointless settlement discussions."

Three months later, on June 23, 2011, McDonnell received an e-mail directly from Stenehjem in which he indicated that he was "extending [] this offer and chance to settle this matter by direct negotiation between you and myself."  Stenehjem indicated that he was in discussion with new counsel, Phillip Griego, but had not yet retained him, and that one of the opportunities he was considering pursuing with Griego would "allow [Stenehjem] to get vindication over the false and serious personal defamatory statements made by Mr. Sareen . . ."  Stenehjem stated further that he was sending the e-mail without informing his counsel, whom he felt "would not approve [of the e-mail] being they want to pursue the course of action that enrichs [*sic*] them the most."  McDonnell responded on July 5, 2011, by e-mail to Stenehjem, with a copy to Heymann, indicating to Stenehjem:  "You are apparently unable to take 'No' for an answer.  AKON is not interested in spending any time on any further settlement discussions of your bogus claims."  Heymann replied that day, indicating that he no longer represented Stenehjem. On the same day, Stenehjem replied, indicating that McDonnell's e-mail "makes my next course of action much easier."

10

Stenehjem did not retain Griego or file a lawsuit immediately after these communications. Instead, one month later, on August 5, 2011, Stenehjem sent McDonnell another e-mail—the one that is the basis for the Cross-Complaint (discussed in detail, *post*). McDonnell did not respond to this e-mail. The next month, Stenehjem, through his current counsel, filed suit.

In his reply to the opposition to the special motion to strike (which included no declarations), Stenehjem asserted that the opposition "wildly misrepresent[ed]" the substance of the August e-mail. He argued that the e-mail contained no demand for money and involved no threat to Sareen. Instead, Stenehejem argued, the August e-mail "merely discuss[ed] litigation procedure. [Stenehjem] requested to meet with Sareen 'face to face' to discuss his claims . . ." Stenehejem argued, therefore, that Sareen's "extortion claim [was] . . . completely unfounded."

III. *The Motion To Strike The Cross-Complaint Should Have Been Denied*

A. Flatley v. Mauro *and Its Progeny*

Michael Flatley, a well-known entertainer, sued attorney D. Dean Mauro for conduct arising out of his representation of a client, Tyna Marie Robertson, who had claimed that Flatley had raped her in his Las Vegas hotel suite. (*Flatley*, *supra*, 39 Cal.4th at p. 305.) Flatley alleged (among other claims) a cause of action for civil extortion arising out of a demand letter Mauro had sent to Flatley. (*Ibid.*) Mauro responded to the suit by filing an anti-SLAPP motion. (*Ibid.*) He argued that the demand letter "was a prelitigation settlement offer in furtherance of his constitutional right of petition" and thus subject to protection under section 425.16. (*Flatley*, at p. 311.) The trial court, affirmed by the Court of Appeal, held that Mauro's communications constituted criminal extortion and were therefore not protected under the anti-SLAPP law. (*Ibid.*) The Supreme Court granted Mauro's petition for review and affirmed.

As a preliminary matter, our high court observed that section 425.16 is intended "to prevent the chilling of 'the valid exercise of the constitutional rights of freedom of

11

speech and petition for the redress of grievances' by 'the abuse of the judicial process.' (§ 426.16, subd. (a).) As a necessary corollary to this statement, because not all speech or petition activity is constitutionally protected, not all speech or petition activity is protected by section 425.16. [Citation.]" (*Flatley*, *supra*, 39 Cal.4th at p. 313.) In reaching this conclusion, the court relied extensively on *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 (*Paul*), disapproved on other grounds in *Equilon*, *supra*, 29 Cal.4th at page 68, footnote 5. (See *Flatley*, at pp. 313-318.) In *Paul*, the appellate court held that the defendants, who had been sued for allegedly interfering with the plaintiff's unsuccessful city council election by using illegal campaign contributions, could not successfully move to strike the complaint as a SLAPP. It held: " '[W]e need not address the second step of section 425.16's two-step motion to strike process because we hold, *as a matter of law*, that defendants cannot meet their burden on the first step. . . . [T]he activity of which plaintiff complains—defendants' campaign money laundering— was not a *valid* activity undertaken by defendants in furtherance of their constitutional right of free speech. This conclusion is established by the factual record before us and is not really disputed by the defendants. Indeed, defendants argue that they are entitled to the benefit of section 425.16 in spite of such illegality.' " (*Flatley*, at p. 314, quoting *Paul*, at p. 1365.) The Supreme Court in *Flatley* "agree[d] with *Paul* that section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition. A contrary rule would be inconsistent with the purpose of the anti-SLAPP statute as revealed by its language. [Citation.]" (*Flatley*, at p. 317.)

The *Flatley* court reviewed the requirements of extortion to determine whether Mauro's demand letter was illegal speech. (*Flatley*, *supra*, 39 Cal.4th at pp. 326-328.) It quoted the relevant criminal statutes, Penal Code sections 518, 519, and 523: " 'Extortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear. . . .' (Pen.Code, § 518.) Fear, for purposes of extortion

12

'may be induced by a threat, either: [¶] . . . [¶] 2. To accuse the individual threatened . . . of any crime; or, [¶] 3. To expose, or impute to him . . . any deformity, disgrace or crime[.]' (Pen.Code, § 519.) 'Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat.' (Pen.Code, § 523.)" (*Flatley*, at p. 326.)

"Extortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal. '[I]n many blackmail cases the threat is to do something in itself perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money.' [Citation.]" (*Flatley*, *supra*, 39 Cal.4th at p. 326, fn. omitted.) Additionally, "threats to do the acts that constitute extortion under Penal Code section 519 are extortionate whether or not the victim committed the crime or indiscretion upon which the threat is based and whether or not the person making the threat could have reported the victim to the authorities or arrested the victim. [Citations.]" (*Id.* at p. 327.)

The court in *Flatley* examined Mauro's demand letter to determine whether it was, on its face, extortion. (*Flatley*, *supra*, 39 Cal.4th at pp. 328-332.) As described by the court, the letter included "threats to publicly accuse Flatley of rape and to report and publicly accuse him of other unspecified violations of various laws unless he 'settled' by paying a sum of money to Robertson of which Mauro would receive 40 percent." (*Id.* at p. 329.) In "[t]he key passage in Mauro's letter . . . Flatley is warned that, unless he settles, 'an in-depth investigation' will be conducted into his personal assets to determine punitive damages and this information will then '**BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT. . . . [¶] Any and all information, including Immigration, Social Security Issuances and Use, and IRS**

**and various State Tax Levies and information will be exposed.**  We are positive the media worldwide will enjoy what they find.'  This warning is repeated in the fifth paragraph:  '**[A]ll pertinent information and documentation, if in violation of any U.S. Federal, Immigration, I.R.S., S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws, shall immediately** [be] **turned over to any and all appropriate authorities**.' "  (*Ibid*; emphasis in original.)  Mauro also made telephone calls to Flatley's attorney, reiterating his demand and threats (*id.* at pp. 329-330) and identifying that an acceptable settlement figure was " 'seven figures.' "  (*Id.* at p. 329.)

Our high court held that Mauro's conduct, including the demand letter, constituted extortion as a matter of law.  (*Flatley*, *supra,* 39 Cal.4th at p. 330.)  "These communications threatened to 'accuse' Flatley of, or 'impute to him,' 'crime[s]' and 'disgrace' (Pen. Code, § 519, subds. 2, 3) unless Flatley paid Mauro a minimum of $1 million of which Mauro was to receive 40 percent."  (*Ibid.*)  The court concluded that because the alleged conduct was extortion as a matter of law, Mauro was not entitled to protection under the anti-SLAPP statute.  (*Id.* at p. 333.)

At least five published cases have followed *Flatley* in concluding that the underlying conduct was illegal as a matter of law and, therefore, the defendant could not strike the complaint under the anti-SLAPP law.  In *Cohen v. Brown* (2009) 173 Cal.App.4th 302, the defendant (attorney Brown) had associated the plaintiff (Cohen, an attorney and physician), to represent a client in a personal injury matter.  (*Id.* at pp. 306-307.)  After a dispute had arisen between the two attorneys that resulted in Cohen filing an attorney fee lien in the personal injury case, and after that case had settled, Brown made a written demand to Cohen.  In his demand, Brown threatened to file an administrative complaint against Cohen with the State Bar if Cohen did not sign off on the client's settlement check to allow all fees to be paid to Brown.  (*Id.* at pp. 310-311.)  Cohen did not comply, and Brown went forward with a State Bar complaint.  (*Id.* at p. 311.)  The appellate court held that Cohen's complaint, which included a claim for

14

civil extortion, was not subject to the anti-SLAPP statute because Brown's conduct constituted extortion. (*Id.* at pp. 317-318.)

In *Mendoza v. Hamzeh* (2013) 215 Cal.App.4th 799 (*Mendoza*), Mendoza received a demand letter from attorney Hamzeh sent on behalf of his client, Mendoza's former employer, indicating: " 'We are in the process of uncovering the substantial fraud, conversion and breaches of contract that [Mendoza] has committed on my client. . . . To date we have uncovered damages exceeding $75,000, . . . If [you do] not agree to cooperate with our investigation and provide us with a repayment of such damages caused, we will be forced to proceed with filing a legal action . . . , as well as reporting [you] to the California Attorney General, the Los Angeles District Attorney, the Internal Revenue Service regarding tax fraud, . . .' " (*Id.* at p. 802.) After Mendoza filed suit alleging (among other claims) a cause of action for civil extortion, Hamzeh filed an anti-SLAPP motion, contending that the underlying demand letter was protected prelitigation activity. (*Ibid.*) The *Mendoza* court held that the trial court had not erred in denying Hamzeh's anti-SLAPP motion because under *Flatley*, the demand letter constituted extortion as a matter of law because it involved a "threat to report criminal conduct . . . *coupled with a demand for money*." (*Mendoza*, at p. 806, original italics.)[11]

---

[11] At least three other cases have followed *Flatley* in concluding that the protections of section 425.16 were unavailable because the moving party's alleged conduct was illegal as a matter of law and therefore not protected activity under the anti-SLAPP statute. (See *Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, 703-706 [claim based on filing of admittedly false police report]; *Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 445-447 [invasion of privacy claim based upon illegal wiretapping]; *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2006) 143 Cal.App.4th 1284, 1296-1297 [claims based upon conspiracy to commit acts of vandalism and harassment, including criminal acts]; but see *Malin v. Singer* (2013) 217 Cal.App.4th 1283, 1298-1300 [anti-SLAPP motion should not have been denied because prelitigation demand letter was neither admitted extortion nor was extortion on its face]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 386-387

continued

15

B.    *Stenehjem's Conduct Constituted Extortion*

We consider whether, in light of *Flatley*, *supra*, 39 Cal.4th 299 and other legal authorities, Stenehjem's August e-mail to McDonnell—the basis for Sareen's Cross-Complaint—constituted extortion as a matter of law that is not protected under the anti-SLAPP statute.  If so, we need not consider the second prong of assessing an anti-SLAPP motion, i.e., whether Sareen established a probability of prevailing on his Cross-Complaint.  (See *Flatley*, *supra*, at p. 320.)

The e-mail, sent to McDonnell at 1:32 in the morning on August 5, 2011, consists of five paragraphs and identifies in its heading the "Subject:  **Qui Tam**."[12]  (Original

_____

[*Flatley* not applicable to preclude anti-SLAPP motion where communications were neither admitted extortion nor were extortion as matter of law, because information for which disclosure was threatened (location of registered sex offender) was public information, not a secret].)

[12] The full text of Stenehjem's August 5, 2011 e-mail to McDonnell reads:  "Dear Mr. McDonnell, [¶] Although you have been quite firm and I feel un-professional in your response to my request to discuss the matter of my wrongful termination and the defamation claim I know is valid face to face, I take your comments about this being a Bogus claim very personnelly [*sic*].  I at no time wanted to cause any un-neccessay [*sic*] or long court procedings [*sic*] to hinder Akon or Mr. Sareen from continuing to doing bussiness [*sic*] as usual.  As Akon's attorney I leave it in your hands to get the facts from Mr. Sareen and Dick Sanders in regards to a contract review by the aduitor [*sic*] Wayne Vartek and the documents I created on orders from Mr. Sareen regarding BOM's and purchase orders for three DLVA's under contract aduit [*sic*].  Mr. Sareen went into great detail about the reasons and figures which he had me write down in my notebook required in the BOM documentation he asked me to provide.  [¶] I never wanted this to become a long and expensive process let alone involve the United States Attorney General, the Department of Justice or the DOD.  Other then [*sic*] the wrongful termination I have never held any ill feeling towards Akon or Mr. Sareen.  I also never wanted to enrich a bunch of bottom feeding attorneys such as yourself and the ones I have been meeting with.  With that said I advise you to forward this to Mr. Sareen, act in good faith as his attorney and decide if this is the manner in which you want to continue responding in [*sic*].  [¶] In closing please inform your client I do not wish to make a Federal case out of this or create any unneccessary [*sic*] stress on Mr. Sareen or any Akon employees.  Please remind Mr. Sareen of his statement that "when I am wrong I will be

continued

16

emphasis.)  It opens with Stenehjem expressing the opinion that McDonnell had been "un-professional in [his] response to 'Stenehjem's request to discuss the matter of [his] wrongful termination and . . . defamation claim[s]. . . [and he took McDonnell's] comments about this being a Bogus claim very personnelly.  [*Sic.*]"  He repeats his attack upon McDonnell's professionalism in the final paragraph.

It is important to consider the context under which the e-mail was sent.  This backdrop included Stenehjem's initial settlement demand through counsel of $675,000; McDonnell's repeated statements that Stenehjem's claims had no merit; and McDonnell's having previously rebuffed any idea of settling the claims.  McDonnell:  (1) advised Stenehjem's attorney, Heymann, six months earlier that the claims were "meritless" and that the only way Stenehjem would receive any monetary payment was by obtaining a judgment against Defendants; (2) told Heymann, in response to the latter's overtures regarding mediation of the dispute, that Akon would not mediate the matter and would not "waste any more time on pointless settlement discussions"; and (3) responded to Stenehjem's personal e-mail of June 23, 2011, in which Stenehjem had sought "to settle

the first to admit it and appoligize [*sic.*]"  [I]t is still my desire to resolve this matter face to face and with no involvement of the courts and a bunch of attorneys serving there [*sic*] own self interests.  [¶] I am extending my hand and this offer to meet one last time because of my disgust with the idea of enriching a large group of bottom feeding attorneys such as you and the ones advising me.  It is not my first choice to procede [*sic*] with the Qui Tam option but the choice of a group of attorneys looking for the biggest payout they can get with the least effort and expense.  I have yet to sign an agreement with the Lawyer out of Los Angeles who specializes in Qui Tam suits but he has reviewed my statement, investigated the facts, talked to former Akon employees, and wants to fly up to sign an agreement and formalize my statement.  [¶] I was always honest with Mr. Sareen[;] hence my disclosure of the pending actions and my extension of one last opportunity to settle this in a gentlemens [*sic*] manner, shake hands and put this matter behind us.  If you are acting [*sic*] in his best interests you will forward this letter to Mr. Sareen and respond in a civil and professional manner and not in the manner which you so un-professionally replied previously.  [¶] Sincerely, Jerry Stenehjem"

17

this matter by direct negotiation," by stating that "AKON is not interested in spending any time on any further settlement discussions of your bogus claims."[13]  Stenehjem in his August e-mail is therefore characterizing as unprofessional McDonnell's consistent position that Stenehjem's claims were unmeritorious and that his clients would pay no money to settle them.

Stenehjem proceeds in the first paragraph of the e-mail to accuse Sareen of misconduct:  "As Akon's attorney I leave it in your hands to get the facts from Mr. Sareen and Dick Sanders in regards to a contract review by the aduitor [*sic*] Wayne Vartek and the documents I created on orders from Mr. Sareen regarding BOM's [bills of materials[14]] and purchase orders for three DLVA's under contract aduit [*sic*].  Mr. Sareen went into great detail about the reasons and figures which he had me write down in my notebook required in the BOM documentation he asked me to provide."  These statements, read in the context of text found later in the e-mail (discussed *post*), make it

---

[13] The context of Stenehjem's August e-mail as presented before us is based entirely on the declaration of McDonnell filed in opposition to the motion.  Because no evidence was submitted on behalf of Stenehjem regarding the prelitigation communications between the parties, the facts are undisputed for purposes of evaluating the motion. (*Mission Springs Water District v. Verjil* (2013) 218 Cal.App.4th 892, 918 [no factual issue presented in considering anti-SLAPP motion where no contrary evidence presented]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 347 [plaintiff did not establish probability of prevailing in opposing anti-SLAPP motion; defendant justified in calling plaintiff a liar where defendant's evidence was that plaintiff threatened to lie to the press about defendant and plaintiff did not refute that evidence].)

[14] Although it is nowhere explicitly stated in the record, our educated guess is that "BOM's" is an acronym used by Stenehjem to refer to bills of materials. (See *In re Static Random Access Memory (SRAM) Antitrust Litigation* (N.D.Cal. 2009) 264 F.R.D. 603, 608, fn. 3 ["BoM is the acronym for Bill of Materials"]; see also *U.S. v. United Technologies Corp., Sikorsky* (D.Conn. 1999) 51 F.Supp.2d 167, 175-178, 181-188 [discussion of bills of materials (BOMs) in government suit that included, among others, a claim under federal False Claims Act].)

18

readily apparent that Stenehjem is accusing Sareen of having engaged in illegal activity by ordering Stenehjem to create accounting documents with false information.

In the second paragraph of the e-mail (immediately after alluding to Sareen's alleged misconduct), Stenehjem raises the possibility of involving federal authorities: "I never wanted this to become a long and expensive process let alone involve the United States Attorney General, the Department of Justice or the DOD [Department of Defense]." Later in the e-mail, he expresses that he "do[es] not wish to make a Federal case out of this." In both the heading and in the text, he refers to a qui tam suit, indicating that "[i]t is not my first choice to procede [sic] with the Qui Tam option" but that he has consulted attorneys who specialize in such cases.

A qui tam action is one " 'brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.' [Citations.]" (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538, quoting Black's Law Dict. (7th ed. 1999) p. 1262, col. 1.) "Qui tam plaintiffs may recover damages and penalties on behalf of public entities for themselves and the entities. [Citation.]" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 325 (*Campbell*).) Qui tam actions are often brought under the federal False Claims Act (31 U.S.C. § 3729 et seq.) and California False Claims Act (Gov. Code, §§ 12650-12656) by private informants who have discovered fraudulent claims made against governmental entities. (See, e.g., *U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ.* (9th Cir. 1998) 161 F.3d 533, 535 [qui tam action under federal act]; *Campbell*, at p. 325 [California False Claims Act].) Thus, Stenehjem's reference to the potential involvement of specified federal agencies, by itself, may be unclear. But viewed in light of Stenehjem's accusation of Sareen's misconduct, and his alluding to bringing a qui tam action, it is plain that Stenehjem is threatening to assert a claim that Sareen had violated the federal False Claims Act and potentially other federal criminal statutes. (See, e.g., 18 U.S.C. § 287 [criminalizing

19

knowingly making false, fraudulent, or fictitious claim to "to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof"; 18 U.S.C. § 286 [criminalizing conspiring to defraud the federal government "by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim"]; 18 U.S.C. § 1001 [criminalizing, among other things, knowingly making "any materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States"].).

We conclude that Stenehjem's August e-mail constituted extortion as a matter of law. It threatened to expose Sareen to federal authorities for alleged violations of the False Claims Act unless he negotiated a settlement of Stenehjem's private claims. Even were it true that Sareen had in fact committed acts violating the False Claims Act—and there is no evidence to support this, since Stenehjem filed no declarations in connection with the motion other than his attorney's fee declaration—this is "irrelevant" to whether the threatened disclosure was extortion. (*Flatley*, *supra*, 39 Cal.4th at p. 330.) And it is of no consequence that the e-mail did not specifically identify the crime of which Stenehjem intended to accuse Sareen. (*Flatley*, at p. 331; *Mendoza*, *supra*, 215 Cal.App.4th at p. 806.)

Furthermore, the alleged criminal activity that Stenehjem threatened to expose in a qui tam action was "entirely unrelated to any alleged injury suffered by" Stenehjem as alleged in his defamation and wrongful termination claims. (*Flatley*, *supra*, 39 Cal.4th at pp. 330-331.)[15] Stenehjem's threat is thus similar to Mauro's threat to expose Flatley of

---

[15] There is no evidence in the record that any communications made by or on behalf of Stenehjem that preceded the August e-mail concerned a claim that Sareen had violated the federal False Claims Act or that Stenehjem was contemplating a qui tam suit. As noted (see fn. 13, *ante*), Stenehjem presented no evidence whatsoever concerning

continued

20

having committed "unspecified violations of various criminal offenses involving immigration and tax law as well as violations of the Social Security Act" (*id.* at p. 330) in an effort to exact a settlement from Flatley for the assault claim asserted by Mauro on his client's behalf. Stenehjem's threat to expose Sareen's alleged crimes is also similar to the threat made by the defendant in *State v. Harrington* (Vt. 1969) 260 A.2d 692 (*Harrington*), a case cited by our high court in *Flatley*. (See *Flatley*, at pp. 328, 329, 331.) In *Harrington*, the defendant, an attorney representing the wife in a divorce proceeding, threatened, among other things, to have his client report the husband to the Internal Revenue Service, the United States Customs Service, or other governmental agencies for unspecified violations if the husband did not agree to a settlement involving a payment of $175,000 to the wife. (*Harrington*, at pp. 695-696.) The Supreme Court of Vermont held that "these veiled threats exceeded the limits of [attorney Harrington's] representation of his client in the divorce action" and constituted extortion. (*Harrington*, at p. 699.)

Stenehjem argues that his e-mail was not extortion because "there simply was no threat to file a false criminal complaint against [Defendants], nor even a demand for money, but simply a 'desire to resolve the matter face to face.' " This position is without merit. The absence of either an express threat or a demand for a specific sum of money in the e-mail does not negate its fundamental nature as an extortionate writing.

The fact that Stenehjem's e-mail may have been less than explicit—in that it did not contain conditional language such as, "Unless Sareen pays me for my claims, I will report him to the federal authorities for violations of the federal False Claims Act"—does not make its character any less illegal. "No precise or particular form of words is

prelitigation communications (other than his attorney's declaration attaching the August e-mail as an exhibit), including the circumstances leading up to his sending the August e-mail.

21

necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [the defendant] and the [target of the threats] may be taken into consideration in making a determination of the question involved." (*People v. Oppenheimer* (1962) 209 Cal.App.2d 413, 422; see also *People v. Massengale* (1968) 261 Cal.App.2d 758, 765.) As our high court explained nearly 100 years ago: "The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime. [Citations.]" (*People v. Sanders* (1922) 188 Cal. 744, 749; see also *Flatley*, *supra*, 39 Cal.4th at p. 327.) Moreover, a threat need not be overt or explicit to constitute attempted extortion by a writing under Penal Code section 523: "It is not necessary that a threat should be apparent from the face of the letter, nor even necessary that it should be implied therefrom. The statute [Pen. Code, § 523] says if the language used is adapted to imply a threat, then the writing is sufficient. Parties guilty of the offense here alleged seldom possess the hardihood to speak out boldly and plainly, but deal in mysterious and ambiguous phrases. . . ." (*People v. Choynski* (1892) 95 Cal. 640, 641-642; see also *People v. Umana* (2006) 138 Cal.App.4th 625, 640.)

Here, the plain implication of Stenehjem's August e-mail was a threat that unless Sareen accepted Stenehjem's "extension of one last opportunity to settle . . . in a gentlemens [*sic*] manner," he would "involve the United States Attorney General, the Department of Justice or the DOD" through a qui tam action alleging Sareen had violated the federal False Claims Act. His multiple references in the e-mail to "bottom[-]feeding attorneys" (including his own prospective attorney)—noting that he did not want to "enrich" them through a lawsuit—evidenced his linking a demand for negotiation and settlement of his personal claims with forgoing a threatened "Qui Tam option" and exposure of Sareen's alleged criminal wrongdoing. Stenehjem's view that the e-mail was

merely a benign desire to meet " 'face to face' " to discuss his claims ignores the implied threat of exposing Sareen's alleged criminal wrongdoing if Sareen persisted in his refusal to negotiate a settlement of Stenehjem's claims, ones that Sareen had repeatedly said were meritless. Stenehjem's stated "request to discuss the matter," viewing the totality of the e-mail and the six-month history leading up to its transmission, was in reality a demand to negotiate and settle his personal claims or else face the potential exposure of unrelated allegations that Sareen had committed criminal acts. The fact that Stenehjem's threats may have been "veiled" (*Harrington*, *supra*, 260 A.2d at p. 699), or "half-couched in legalese does not disguise their essential character as extortion. [Citations.]" (*Flatley*, *supra*, 39 Cal.4th at p. 330.)

And the fact that Stenehjem did not make a specific monetary demand in the August e-mail does not preclude a finding that it was extortion as a matter of law. (See *People v. Hesslink* (1985) 167 Cal.App.3d 781, 787 [rejecting defense argument that there was insufficient evidence of extortion because he had not make "a request or demand for a specific sum"].) In *Barton v. State Bar* (1935) 2 Cal.2d 294 (*Barton*), our high court concluded that an attorney who had threatened to report to the prosecutor an oil company's alleged practice of illegal product adulteration unless the company made " 'some sort of settlement' " with the attorney's clients (*id.* at p. 296) was conduct both warranting disbarment and "constituted an attempt to extort money as said crime is defined in sections 518, 519, and 524 of the Penal Code." (*Id.* at p. 297.)[16]

---

[16] Stenehjem also contends that the August e-mail could not constitute extortion because "there was certainly no money demanded of [Sareen] personally. Indeed, the employment claims concerned [Stenehjem's] former employer, Akon, not [Sareen], and the August 5 e[-]mail addressed Mr. McDonnell 'as Akon's attorney.' " This argument is an inaccurate representation of the record. Stenehjem indicated early in the e-mail that "[a]s Akon's attorney[,] I leave it in your hands to get the facts . . ." concerning the bills of materials Stenehjem allegedly prepared at Sareen's direction. But Stenehjem also mentions Sareen by name 10 times. Stenehjem requests that McDonnell "get the facts

continued

23

Lastly, Stenehjem relies on *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903 (*Blanchard*), and *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 (*Dove Audio*), to support his contention that the conduct underlying the Cross-Complaint is protected under the anti-SLAPP statute. Neither case supports his position.

Our high court in *Flatley* specifically addressed and rejected Mauro's contention that *Blanchard*, *supra*, 123 Cal.App.4th 903, established "that the anti-SLAPP statute applies to prelitigation demand letters that are extortionate because such letters are protected by the litigation privilege." (*Flatley*, *supra*, 39 Cal.4th at p. 325, fn. 12.)[17] The Supreme Court noted that although the litigation privilege is relevant in analyzing the second step of an anti-SLAPP motion—i.e., whether the plaintiff (or cross-complainant) has demonstrated a probability of prevailing—Civil Code section 47 and the anti-SLAPP statute "are not substantively the same." (*Flatley*, at p. 323.)[18] The court therefore held

----

from" Sareen; "forward this" e-mail to Sareen; "remind Mr. Sareen" of a statement he had made; and "act in good faith as [Sareen's] attorney." Clearly, the e-mail was not directed to McDonnell solely in his capacity as attorney for the company. Further, Stenehjem's assertion that "the employment claims concerned [Stenehjem's] former employer, Akon, not [Sareen]" ignores the fact that his e-mail refers to both his "wrongful termination and the defamation claim[s]," and is belied by the fact that the Complaint alleged wrongful termination and breach of implied covenant claims against both Akon *and* Sareen.

[17] The litigation privilege codified in Civil Code section 47, subdivision (b), states in relevant part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. . . ."

[18] Our high court observed that the two laws have different goals. While the litigation privilege "serves broad goals of guaranteeing access to the judicial process, promoting the zealous representation by counsel of their clients, and reinforcing the traditional function of the trial as the engine for the determination of truth," "[t]he

continued

24

that the litigation privilege "does not operate as a limitation on the scope of the anti-SLAPP statute. . . . [W]e reject Mauro's contention that, because some forms of illegal litigation-related activity may be privileged under the litigation privilege, that activity is necessarily protected under the anti-SLAPP statute." (*Id.* at p. 325.)  In this context, the *Flatley* court, discussing *Blanchard*, observed that the plaintiffs there were found to have not made the second-prong showing of the anti-SLAPP statute of a probability of prevailing because the underlying conduct, "demand letters[,] were privileged under the litigation privilege as prelitigation communication. . . (*Blanchard*, *supra*, 123 Cal.App.4th at pp. 918-922.)  Thus, *Blanchard* did not involve the question of whether the demand letter was extortion as a matter of law and thus unprotected by the First Amendment so as to bar DIRECTV from using the anti-SLAPP statute to strike the plaintiffs' action.  Rather, the plaintiffs conceded that their lawsuit arose from DIRECTV's protected petitioning activity.  (*Id.* at p. 918.)  Accordingly, *Blanchard* is irrelevant to the issues presented here."  (*Flatley*, at p. 325, fn. 12.)

*Dove Audio*, *supra*, 47 Cal.App.4th 777, a defamation case in which a special motion to strike was granted, similarly offers no support to Stenehjem.  In that case, the appellate court held that the defendant's communications—letters inquiring about private citizens' potential willingness to support a proposed complaint to the State Attorney General to investigate the plaintiff's alleged underpayment of royalties designated to charities—was protected petition activity under section 425.16.  (*Dove Audio*, at pp. 783-784.)  The defendant was therefore held to have made its threshold showing under the first prong of the statute (that he engaged in protected activity), thereby shifting the

purpose of section 425.16 is to protect the valid exercise of constitutional rights of free speech and petition from the abuse of the judicial process [citation], by allowing a defendant to bring a motion to strike any action that arises from any activity by the defendant in furtherance of those rights."  (*Flatley*, *supra*, 39 Cal.4th at p. 324.)

burden to the plaintiff to establish a probability of prevailing. (*Ibid.*) Because the court held that the defendant's communications were absolutely privileged under the litigation privilege, it found that the plaintiff had not established a probability of success and that the anti-SLAPP motion was properly granted. (*Id.* at pp. 784-785.) *Dove Audio* did not involve a claim that the underlying conduct was illegal, and thus does not support Stenehjem's contention that his prelitigation e-mail demand was protected under the anti-SLAPP statute.

We are mindful that our high court observed that "rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing [do not] necessarily constitute extortion." (*Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16.) And we note that *Flatley*'s conclusion that Mauro's communication constituted criminal extortion as a matter of law was based "on the specific and extreme circumstances" of the case. (*Ibid.*) Here, although Stenehjem's August e-mail communication may not involve a threat as extreme as the one in *Flatley*, it is nonetheless extortion as a matter of law. It is therefore not protected under the anti-SLAPP statute (*Flatley*, at pp. 317, 333). Thus, the trial court erred in granting Stenehjem's motion to strike the Cross-Complaint.[19]

---

[19] Because we have concluded that Stenehjem did not meet his threshold showing that the activity underlying the allegations of the Cross-Complaint was protected under the anti-SLAPP statute, we need not consider the second prong, i.e., whether the record demonstrates that Sareen established a probability of prevailing. (*Flatley*, *supra*, 39 Cal.4th at p. 320.)

## DISPOSITION

The order granting respondent Jerome Stenehjem's special motion to strike appellant Surya Sareen's amended Cross-Complaint pursuant to the anti-SLAPP statute is reversed.

_____
Márquez, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Premo, J.

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 111CV209402 |
| Trial Judge: | The Honorable Mark H. Pierce |
| Attorneys for Plaintiff, Cross-defendant and Respondent<br>Jerome Stenehjem: | Law Office of Mark W. Hostetter<br><br>Mark W. Hostetter |
| Attorneys for Defendant, Cross-complainant and Appellant.<br>Surya Sareen: | Myers, Hawley, Morley, Myers & McDonnell<br><br>John P. McDonnell |