Filed 5/5/26  Jeffers v. Perez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| SUSAN JEFFERS et al., | B339129 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 23SMCV01522) |
| v. | |
| GERONIMO PEREZ et al., | |
| Defendants and Respondents. | |

Appeal from an order of the Superior Court of Los Angeles County, Lisa K. Sepe-Wiesenfeld, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Martorell Law, Eduardo Martorell, and JoAnn Victor for Plaintiffs and Appellants Susan Jeffers and 2444 Fourth Street, LLC.

Rosing Pott & Strohbehn, Heather L. Rosing, and Amy P. Chambers for Defendants and Respondents Geronimo Perez and Daniels, Fine, Israel, Schonbuch & Lebovits, LLP.

The Maloney Firm, Gregory M. Smith, Patrick M. Maloney, and Susan M. Freedman for Defendant and Respondent Larry Moore.

_____

This appeal arises out of a decade-long dispute over a residential unit in a previously rent-controlled, 10-unit building in Santa Monica, California.

Respondent Larry Moore (Moore) began subleasing unit 5 in the 2444 Fourth Street building in 1991.  Shortly after Moore moved in, the building's owner filed an application to convert the building's units into condominiums, pursuant to Santa Monica's Tenant Ownership Rights Charter Amendment (TORCA).  "Under TORCA, a conversion could be accomplished without a removal permit if the tenants were offered an opportunity to purchase their units, and two-thirds of the tenants supported the conversion application."  (*Bohbot v. Santa Monica Rent Control Bd.* (2005) 133 Cal.App.4th 456, 460.)  The TORCA purchase price for unit 5 was $170,000.

Moore tried unsuccessfully to purchase unit 5 pursuant to TORCA, eventually filing two lawsuits (in 2013 and 2018) seeking to force the sale.  The trial court consolidated Moore's actions and, following a bench trial, ruled against him.  The court found that, as a subtenant, Moore did not qualify as a "participating tenant" entitled to compel a TORCA purchase.  The court further found that, although Moore's sublessors had validly assigned him their "participating tenant" status, the sublessors' TORCA purchase rights had expired prior to the assignment.

In 2022, respondent Geronimo Perez—an attorney and Moore's neighbor in the 2444 Fourth Street building—agreed to

represent Moore in filing a third lawsuit asserting the right to purchase the unit at the $170,000 TORCA price. In this third suit, Moore alleged that the March 2022 issuance of a new final subdivision report for the building had triggered an additional two-year TORCA purchase period, pursuant to certain conditions enumerated in the City of Santa Monica's approval of the building's TORCA application. Appellant 2444 Fourth Street LLC (the LLC), which owned the unit, successfully demurred to the complaint. The court dismissed Moore's action with prejudice and awarded the LLC attorney fees and costs.

The LLC then sued Moore, Perez, and Perez's law firm for malicious prosecution. In the same complaint, appellant Susan Jeffers (Jeffers), the sole member of the LLC, asserted a claim for financial elder abuse against Moore based on his attempts to acquire unit 5. Jeffers also asserted claims for breach of fiduciary duty and attempted extortion against Perez and his firm. Jeffers alleged that Perez—who previously had represented Jeffers in a probate action—had violated his duty of loyalty by representing Moore, and that Perez had made extortionate statements in a declaration and a meet-and-confer letter in Moore's third lawsuit.

Moore, Perez, and Perez's law firm filed "anti-SLAPP"[1] special motions to strike the complaint, pursuant to Code of Civil Procedure section 425.16.[2] The trial court granted the motions in full and dismissed the complaint with prejudice.

---

[1] " 'SLAPP stands for "Strategic Lawsuit Against Public Participation." ' " (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 710, fn. 1 (*Lee*), quoting *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 835, fn. 1.)

[2] Unspecified statutory references are to the Code of Civil Procedure.

Jeffers and the LLC now ask us to reverse the order granting the special motions to strike. Jeffers argues her claims for extortion and breach of fiduciary duty do not arise from activity protected by the anti-SLAPP statute. And both Jeffers and the LLC contend they have demonstrated a probability of prevailing on their claims.

We agree with Jeffers that Perez's statements in his declaration and letter amount to extortion as a matter of law and thus fall outside the ambit of section 425.16's protection. But we conclude that Jeffers's and the LLC's remaining claims arise from protected activity. We further conclude that Jeffers has demonstrated the requisite probability of success on her breach of fiduciary duty claim, but that she and the LLC have failed to make an adequate showing with respect to their remaining claims: Jeffers fails to allege a "taking" sufficient to support her financial elder abuse claim. And the LLC fails to demonstrate that Moore's third lawsuit was so completely lacking in merit that it supports a claim for malicious prosecution.

Accordingly, we reverse the portion of the court's order striking Jeffers's claims for extortion and breach of fiduciary duty. We otherwise affirm.

## FACTUAL SUMMARY AND PROCEDURAL HISTORY

We summarize only the facts and procedural history relevant to our resolution of this appeal. Consistent with the applicable standard of review, we draw our summary from " 'the pleadings and the factual material submitted in connection with the special motion[s] to strike.' " (*Optional Capital, Inc. v. Akin Gump Strauss, Hauser & Feld LLP* (2017) 18 Cal.App.5th 95, 111 (*Optional Capital*).)

4

## A. Jeffers's Father Initiates the TORCA Conversion Process for the 2444 Fourth Street Building

In 1991, Jeffers's father—then the owner of the 2444 Fourth Street building through his trust—filed an application pursuant to TORCA to convert the building's units into condominiums. In 1992, the City of Santa Monica approved the application, subject to certain conditions enumerated in a "consent to conditions agreement." (Capitalization omitted.) Jeffers's father executed the agreement.

As relevant here, condition 1 of the agreement affords "any participating tenant . . . the right to specific enforcement of [the consent to conditions] agreement in addition to any other remedies provided by law." (Capitalization omitted.) Condition 2 of the agreement, in turn, provides: "The owner shall offer and continue to offer the exclusive right to purchase each rental unit in the building to the participating tenant thereof upon the terms set forth in the application, without change, for a period of not less than two (2) years from the date of final approval by the California Department of Real Estate or the date the first unit in the building is offered for sale, if approval by the California Department of Real Estate is not required." (Capitalization omitted.)

In 2009, the California Department of Real Estate issued a final subdivision public report (the 2009 report) for the building authorizing the TORCA conversion. The 2009 report expired by its own terms on January 16, 2014.

## B. Perez Represents Jeffers in the Probate Action Through Which She Obtains Rights to Unit 5

In 2004, Jeffers's father died. Jeffers's brothers then sued Jeffers in probate court, in her capacity as former trustee of their father's trust. Jeffers retained Perez to represent her in the probate

5

litigation. At the time, Perez was an attorney with the law firm of Wong Fleming, P.C.

In October 2014, Perez negotiated a settlement in the probate action. Pursuant to the terms of the settlement, Jeffers received the sole membership interest in the LLC, which owned unit 5.

Seven months later, in May 2015, Perez withdrew as Jeffers's counsel in the probate action. Perez attests he withdrew because Jeffers disregarded his advice that she must file a notice of change of ownership with the county concerning unit 5. He further attests that he believes Jeffers refused to file the change of ownership to avoid paying increased property taxes on the unit.

Jeffers failed to pay Perez's legal fees in full. Perez's law firm assigned Perez its rights to recover legal fees and expenses against Jeffers incurred in the probate action. Perez later sued Jeffers and the LLC to recover the unpaid attorney fees (see *post*).

### C.    Moore Files Two Lawsuits Asserting the Right to Purchase Unit 5 at Its TORCA Price

About a year before the probate action settlement, in 2013, Moore filed a complaint against the LLC asserting the right to purchase unit 5 at its $170,000 TORCA price. (See *Moore v. 2444 Fourth Street LLC* (Super. Ct. L.A. County, No. SC121224).) In this first action, Moore alleged that he qualified as a "participating tenant" under TORCA and the consent to conditions agreement.

In 2017—while the 2013 action still was pending—the Bullucks (Moore's sublessors) assigned to Moore their rights as "participating tenants." Moore then filed a second lawsuit in January 2018 (*Moore v. 2444 Fourth Street LLC* (Super. Ct. L.A. County, No. SC128726)), alleging he was entitled to buy unit 5 for $170,000 as an "assignee" of a "participating tenant."

The trial court consolidated the 2013 and 2018 actions and held a bench trial. The court found that Moore did not qualify

6

as a participating tenant because TORCA "require[s] that a subtenant . . . be in possession [of a unit] for at least six months as of the filing of the [TORCA conversion application] to be eligible for participating tenant status," and "Moore was not in possession of unit 5 for six months" prior to the application's submission. (Capitalization omitted.) The court further found that the Bullucks' assignment of their "participating tenant" status to Moore was "valid," but that the Bullucks' right to purchase the unit at the TORCA price had expired prior to the date of the assignment. The court therefore concluded Moore was not entitled to purchase the unit at the $170,000 TORCA price and entered judgment in favor of the LLC on July 24, 2020. Moore did not appeal the judgment.

### D. Perez Settles His Suit Against Jeffers Seeking Unpaid Attorney Fees from the Probate Action

As set forth, *ante*, in June 2018, Perez sued Jeffers to recover allegedly unpaid attorney fees incurred in the probate action. In June 2021, with the assistance of a settlement judge, Jeffers (represented by new counsel) reached a settlement with Perez.

Pursuant to the settlement agreement, Jeffers provided Perez with two promissory notes secured by deeds of trust against the unit. One promissory note, in the amount of $40,184.76, corresponded to the allegedly unpaid attorney fees. The other, in the amount of $35,053.51, corresponded to homeowners' association fees Perez had paid on Jeffers's behalf.

The settlement agreement afforded Jeffers until March 31, 2022 (i.e., nine months) to pay off the notes. If Jeffers failed to make the payments on time, the deeds of trust entitled Perez to foreclose on unit 5 to collect the amounts owed to him. In addition, the deeds of trust included the right to assignment of rent due on the unit.

7

### E. The Department of Real Estate Issues a New Final Subdivision Report for the Building

On March 9, 2022, the California Department of Real Estate issued a new final subdivision public report (the March 2022 report) for the 2444 Fourth Street building. Perez attests that, based on his understanding of the TORCA statute and process, the issuance of the March 2022 report triggered a new two-year period in which "participating tenants" could purchase a unit in the building at the TORCA price.

### F. Jeffers Fails to Pay, and Perez Assigns the Promissory Notes and Deeds of Trust to Moore

On March 23, 2022, Perez emailed Jeffers's then-counsel, Harry Floyd, informing him that the notes were "due and payable on March 31, 2022." Floyd responded that same day, informing Perez:

"I understand that the LLC is ready to sell to [Moore] and will satisfy the obligations from the proceeds of that sale, which is awaiting reinstatement of the LLC by the Secretary of State, to which all necessary documents and payments have been submitted."

Jeffers, however, failed to sell the unit to Moore or to pay the amounts owed as the March 31, 2022 deadline approached. Perez attests "[he] could not wait any longer than the nine months provided to [Jeffers] to issue the settlement payment" because "[he] was still obligated to pay [his former law] firm back a portion of the fees." He therefore "decided to sell the [notes and deeds of trust] to the first buyer willing to pay full value rather than pursue a judicial foreclosure sale." Perez further attests that he reached out to Moore's then-attorney to see whether Moore might be interested in purchasing the notes and deeds of trust for the notes' full price,

8

plus interest. Perez attests that Moore agreed and wired the necessary funds to complete the transaction.

On March 31, 2022, Perez again emailed Jeffers's counsel to inform him of the assignment of the notes and deeds of trust to Moore. Perez's email further provided: "[Moore] will proceed to foreclose and collect on the attached accordingly."

### G. Moore—Now Represented By Perez—Files a Third Lawsuit Asserting the Right to Purchase Unit 5 at the TORCA Price

In late March 2022—around the time Perez negotiated the assignment of the notes and deeds of trust to Moore—Perez agreed to represent Moore in attempting to purchase unit 5 pursuant to the new March 2022 report. By this time, Perez was a partner with the law firm of Daniels, Fine, Israel, Schonbuch & Lebovits, LLC.

On March 26, 2022, Moore sent Jeffers a letter purporting to "accept" his right to purchase the unit pursuant to TORCA and the March 2022 report. On April 7, 2022, Perez emailed the letter to Floyd. That same day, Floyd sent the following response:

"I have previously informed you that I do not currently represent . . . Jeffers, and that also applies to [the LLC]. However, with respect to your claim [that] Larry Moore has a right to purchase unit 5 at the TORCA purchase price of $170,000.00 as a participating tenant, as Mr. Moore well knows, he has no such right, with his alleged status in that regard having been determined against him in a judgment which I have attached for your review. You and Mr. Moore should therefore govern yourselves accordingly."

On April 11, 2022, Perez filed suit on behalf of Moore against the LLC (hereafter, the third Moore lawsuit), asserting causes of action for (1) third-party beneficiary breach of written contract, and (2) breach of written contract. The complaint alleged that, under the terms of the consent to conditions agreement,

9

issuance of the March 2022 report triggered a new two-year period in which Moore, as a participating tenant or an assignee of a participating tenant, could purchase unit 5 at the TORCA price of $170,000. The complaint further alleged that, by refusing to sell the unit to Moore, the LLC had breached the consent to conditions agreement. Among other remedies, Moore sought specific performance of the agreement—i.e., that the LLC allow him to purchase the unit for $170,000.

On April 12, 2022, Perez filed a notice of lis pendens identifying the unit as the subject of the dispute in the third Moore lawsuit. In addition, Moore recorded a notice of default and election to sell the unit pursuant to the deeds of trust. Finally, pursuant to the assignment of rents provision in the deeds of trust, Moore stopped paying rent on the unit.

Jeffers alleges that Perez's and Moore's actions impeded her ability to refinance the unit in order to pay off the notes and avoid foreclosure. She further alleges that, "fortuitously, [she was] able to refinance the unit through the beneficence of a private lender and thereby was able to pay the promissory notes and avoid[ ] a foreclosure sale." (Capitalization omitted.)

**H.    The LLC Secures a Dismissal of the Third Moore Lawsuit with Prejudice and Recovers Its Attorney Fees and Costs**

On July 26, 2022, the LLC's new attorney, Bruce Lorman, wrote a meet-and-confer letter to Perez advising that the LLC intended to file a demurrer to the complaint in the third Moore lawsuit. The letter further provided, in pertinent part:

"Please be advised that if this action is not voluntarily dismissed, this is to put you on notice that you are exposing yourself and your firm to substantial liability for malicious prosecution. . . . [¶] In addition to the demurrer and motion to strike, this is to

10

advise you that we are reviewing your prior representation of [the LLC] and now your representation of [Moore] against your former client. Such conduct potentially breaches your fiduciary and professional duties to your former client. I am interested [in] hearing from you why you believe you can sue your own former client."

Moore did not dismiss the suit, and the LLC filed its demurrer. The LLC argued the doctrine of issue preclusion barred Moore's claims because the court in Moore's prior consolidated actions had determined that Moore did not qualify as a participating tenant entitled to purchase the unit at the TORCA price.

In response, Moore argued the court in the prior actions had made its determinations relying on the 2009 report, which expired in 2014, and that the March 2022 report rendered the prior findings as to his "participating tenant" status "overripe, non-justiciable, . . . moot[,] and . . . void." (Italics omitted.) He further argued that issuance of the March 2022 report triggered a new two-year period during which he could purchase unit 5 at its TORCA price because (1) the trial court in the prior consolidated actions found the Bullucks' assignment of their "participating tenant" rights to Moore was "valid," but that the Bullucks' rights as participating tenants to purchase the property at the TORCA price had expired prior to the assignment, (2) the express terms of the consent to conditions agreement require the building owner "to offer the . . . right to purchase [the] unit" at the TORCA price "for a period of not less than two . . . years from the date of final approval by the California Department of Real Estate," and (3) after the 2009 report expired, the March 2022 report constituted the relevant "final approval" under Business and Professions Code

11

sections 11018 and 11018.2, thereby reviving the previously expired "participating tenant" TORCA purchase rights.[3]

At the October 17, 2022 hearing on the demurrer, Perez argued on Moore's behalf:  "[E]ven if the underlying actions are not moot and even if the underlying actions are determinative of the ruling on the 2009 public report, . . . then [the court] has to accept the [prior] finding . . . that says that the assignment [of participating tenant rights] from the Bullucks to Mr. Moore is valid.  [¶]  And the reason that is significant is because defendants obtained a public report in 2022.  From that springs the right to purchase . . . at the TORCA price.  Every time a public report is issued, you have to offer the right to the participating tenant to purchase. . . . [¶]  So whether the court finds that it's moot or whether it finds that it's not moot, Mr. Moore still has . . . standing to pursue his breach of contract claims under the 2022 final subdivision public report."

At the conclusion of the hearing, Perez emphasized the case involved "an issue of first impression."  The judge stated she would "take a second look based on [Perez's] arguments" and took the matter under submission.  Later that day, the court issued a

---

[3] Section 11018 of the Business and Professions Code provides, in pertinent part:  "The Real Estate Commission shall make an examination of any subdivision, and shall, unless there are grounds for denial, issue to the subdivider *a public report authorizing the sale* or lease in this state of the lots or parcels within the subdivision."  (Bus. & Prof. Code, § 11018, italics added.)  Section 11018.2, in turn, provides in relevant part:  "No person shall sell or lease, or offer for sale or lease in this state any lots or parcels in a subdivision without first obtaining a public report from the Real Estate Commissioner."  (*Id.*, § 11018.2.)

written ruling sustaining the LLC's demurrer. The court reasoned, in pertinent part:

"[The LLC] argues the doctrine of issue preclusion bars [Moore] from relitigating [his "participating tenant" status] in this action as a court already adjudicated these issues adversely to [Moore] in prior litigation. The court agrees.

"[¶] . . . [¶]

" . . . If [Moore] truly believed the issue of his status as a participating tenant under TORCA was mooted by the expiration of the 2009 . . . report, he would not have filed a second action in 2018 seeking to force [the LLC] to sell him the unit at the TORCA purchase price. . . . Having specifically sought a judicial determination of [his] rights to purchase under TORCA after the expiration of the 2009 . . . report, [Moore] cannot now show his request was moot by the expiration of that report.

"[Moore] has also not demonstrated the expiration of the 2009 . . . report had any bearing on his status as a TORCA participating tenant, either by virtue of his subtenancy or assignment of the Bullucks' TORCA rights." (Capitalization omitted.)

But the court did not address Moore's theory that the Bullucks had validly assigned him their "participating tenant" status and expired TORCA purchase rights, and that issuance of the March 2022 report had revived those previously expired rights.

The court dismissed the third Moore lawsuit with prejudice, and the LLC then moved for $47,880 in costs and attorney fees. In his declaration in support of the fee request, the LLC's attorney attested that defense of the third Moore lawsuit "involved complex legal and factual issues relating to[, inter alia,] [Perez's] . . . apparent violation of his fiduciary duties of loyalty." The

13

declaration also quoted from the July 26 meet-and-confer letter accusing Perez of possible breaches of his fiduciary duties.

In response, on March 1, 2023, Perez filed his own declaration in which he attested, in pertinent part:

"[The LLC's] supporting declaration . . . conveniently ignores and fails to mention that [the LLC's] manager, . . . Jeffers, and her accountant . . . conspired and used . . . Jeffers's prior probate case and the court system to intentionally perpetrate multiple crimes against the County of Los Angeles, the State of California, and the United States, which continue to this day and which resulted in the termination of the attorney-client relationship in her probate case."

In addition, on March 22, 2023, Perez sent a letter to the LLC's attorney accusing Jeffers of "intentionally committing tax fraud" by "intentionally failing to disclose the transfer of 100 [percent] membership interest in" the LLC from her father's trust to her individually, pursuant to the probate action settlement. (Underscoring omitted.)  The letter described Jeffers's allegedly criminal conduct in considerable detail and included images of Jeffers's (presumptively privileged) attorney-client communications with Perez from 2015.

Perez contends that his purpose in filing the March 1 declaration and sending the March 22 letter "was to point out that Jeffers's unclean hands precluded her from successfully pursuing the threatened malicious prosecution and breach of fiduciary duty claims based on Perez's prior representation of Jeffers in her capacity as a trustee."

On March 27, 2023, the court granted the LLC's motion for attorney fees and costs.  The court, however, reduced the award to $39,780 based on its determination that the originally requested amount included fees for time spent on work "which was not

14

necessary for the defense of this action or unrelated to the subject matter of this lawsuit."

## I. Jeffers and the LLC File Suit Against Moore, Perez, and Perez's Law Firm

Less than two weeks later, on April 7, 2023, Jeffers and the LLC filed a joint complaint against Moore, Perez, and Perez's law firm. Jeffers asserted causes of action for (1) attempted extortion against Perez and his law firm (collectively, the attorney respondents), (2) breach of fiduciary duty against the attorney respondents, and (3) financial elder abuse against Moore. The LLC asserted a cause of action for malicious prosecution against all three defendants. Finally, both Jeffers and the LLC asserted a negligence cause of action against all the defendants.

The crux of the complaint's allegations was that Perez and Moore filed the third Moore lawsuit for the improper purpose of putting financial pressure on Jeffers through the recording of the lis pendens. Jeffers alleged the lis pendens "created a cloud on title to the unit and substantially interfered with [her] ability to obtain the funds needed to pay off" the promissory notes to avoid foreclosure. (Capitalization omitted.) She further alleged this was part of an overarching strategy by Perez and Moore "to assist the foreclosure sale of the unit in order to attempt to acquire [it] at a substantial discount." (Capitalization omitted.)

## J. The Trial Court Grants the Anti-SLAPP Special Motions to Strike Filed By Moore and the Attorney Respondents

The attorney respondents and Moore each filed an anti-SLAPP special motion to strike the causes of the action in the complaint. Jeffers and the LLC opposed the motions, offering

15

declarations from Jeffers and Jeffers's mortgage broker, Dan Spitz, in support of the oppositions.

On May 8, 2024, the trial court granted the motions in full. The court concluded that all the claims arose from protected activity because they were based on Moore's and the attorney respondents' litigation of the third Moore lawsuit against the LLC. The court further concluded that Jeffers and the LLC had failed to demonstrate a probability of prevailing on any of the claims. It found, in pertinent part, that (1) the litigation privilege barred the extortion claim, (2) Jeffers had failed to offer sufficient evidence in support of the breach of fiduciary duty claim, (3) Jeffers had failed to adequately allege the financial elder abuse claim, and (4) the LLC had failed to make a sufficient showing that Moore and Perez initiated the third Moore lawsuit "with malice," as required to support the claim for malicious prosecution. The court therefore dismissed the claims with prejudice and awarded the attorney respondents and Moore their reasonable attorney fees and costs.

Jeffers and the LLC timely appealed. On appeal, Jeffers and the LLC have abandoned their cause of action for negligence, and we therefore do not further discuss that claim.

## DISCUSSION

### A. Law Governing Anti-SLAPP Motions and Standard of Review

"The anti-SLAPP statute is 'designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."

16

[Citation.]' [Citation.]" (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008–1009 (*Bonni*).)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.]" (*Bonni, supra*, 11 Cal.5th at p. 1009.) "A defendant's burden on the first prong is not an onerous one. A defendant need only make a prima facie showing that plaintiff's claims arise from the defendant's constitutionally protected free speech or petition rights. [Citation.]" (*Optional Capital, supra*, 18 Cal.App.5th at p. 112.) A defendant makes the required showing " 'by demonstrating that the act underlying the . . . cause [of action] fits one of the categories spelled out in section 425.16, subdivision (e).' [Citation.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) As relevant here, two such categories are: "(1) any written or oral statement . . . made before a . . . judicial proceeding," and "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(1)–(2).)

Second, "[i]f the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) "The plaintiff must do so with admissible evidence." (*Optional Capital, supra*, 18 Cal.App.5th at p. 112.) "The Supreme Court has 'described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and

evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' [Citation.]" (*Lee*, *supra*, 41 Cal.App.5th at p. 719.) "If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni*, *supra*, 11 Cal.5th at p. 1009.)

We review an order granting a special motion to strike de novo. (See *Lee*, *supra*, 41 Cal.App.5th at p. 719.)

### B. With the Exception of Jeffers's Extortion Cause of Action, the Claims Arise from Protected Activity

Jeffers contends the trial court incorrectly concluded that her claims for attempted extortion and breach of fiduciary duty arise from protected activity.[4] We agree with Jeffers with respect to her claim for extortion, but reject her contention as to the breach of fiduciary duty cause of action.

We first consider Jeffers's extortion claim. "Extortion includes 'the obtaining of property or other consideration from another, with his . . . consent . . . , induced by a wrongful use of force or fear . . . .' [Citation.] What constitutes a wrongful use of force or fear for these purposes is defined in Penal Code section 519 [citation], and includes 'a threat . . . [¶] . . . [t]o expose, or to impute to [the person threatened a] disgrace, or crime. . . .' [Citation.]" (*Flickinger v. Finwall* (2022) 85 Cal.App.5th 822, 833; see *People v. Baker* (1978) 88 Cal.App.3d 115, 119 [for purposes of extortion, "property" includes " 'a right to recover money or other personal property by a judicial proceeding' "].)

" 'No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be

---

[4] Jeffers and the LLC do not dispute that their remaining claims arise from activity protected by the anti-SLAPP statute.

18

made by innuendo and the circumstances under which the threat is uttered and the relations between [the defendant] and the [target of the threats] may be taken into consideration in making a determination of the question involved.' [Citations.]" (*Stenehjem v. Sareen* (2014) 226 Cal.App.4th 1405, 1424 (*Stenehjem*).) "The absence of either an express threat or a demand for a specific sum of money . . . does not negate [a communication's] fundamental nature as an extortionate writing." (*Ibid.*) Indeed, "[a]s our high court explained nearly 100 years ago: 'The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime. [Citations.]' " (*Ibid.*, quoting *People v. Sanders* (1922) 188 Cal. 744, 749–750.)

In the complaint, Jeffers alleges Perez committed attempted extortion by (1) filing the March 1, 2023 declaration in the third Moore lawsuit accusing her of unspecified crimes, and (2) sending the March 22, 2023 meet-and-confer letter to Jeffers's then-attorney accusing Jeffers of tax fraud. Jeffers further alleges the accusations were made as threats "to intimidate and instill fear in [her] so that [she] would not bring [the instant] action." Although, on their face, these activities "fit . . . the categories spelled out" in subdivisions (e)(1) and (e)(2) of section 425.16 (*Optional Capital*, *supra*, 18 Cal.App.5th at p. 110), Jeffers contends the activities nonetheless are excluded from anti-SLAPP protection pursuant to *Flatley v. Mauro* (2006) 39 Cal.4th 299 (*Flatley*). We agree.

In *Flatley*, D. Dean Mauro, an attorney, sent a demand letter on behalf of his client, Tyna Marie Robertson, to well-known entertainer Michael Flatley. (*Flatley*, *supra*, 39 Cal.4th at p. 305.) The letter claimed that Flatley had raped Robertson and demanded

19

a seven-figure payment to settle Robertson's claims. (*Ibid.*) Mauro repeated the demands in subsequent phone calls. (*Ibid.*) And he threatened to " 'go public' " with the allegations if Flatley failed to pay. (*Id.* at p. 311.) Flatley did not pay (*ibid.*); instead, he sued Mauro for civil extortion. (*Id.* at p. 305.) The trial court denied Mauro's special motion to strike Flatley's complaint under the anti-SLAPP statute, and the appellate court affirmed the denial. (*Ibid.*)

Our high court likewise affirmed, concluding that "where a defendant brings a motion to strike under section 425.16 . . . but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Flatley*, *supra*, 39 Cal.4th at p. 320.) The court "emphasize[d] that [its] conclusion . . . [was] based on the specific and extreme circumstances of [the] case" (*id.* at p. 332, fn. 16), which included threats to report criminal activities "entirely unrelated" to Robertson's claims against Flatley. (*Id.* at p. 330.)

As in *Flatley*, the extreme circumstances of this case bring Perez's communications outside the protection of the anti-SLAPP statute. Taken together, Perez's March 1 declaration and March 22 letter amounted to extortion as a matter of law. In the publicly filed declaration, Perez made oblique references to unspecified criminal conduct by Jeffers. In the subsequent letter sent only to Jeffers's counsel, Perez described in rich detail the alleged tax fraud he impliedly threatened to expose if Jeffers filed suit against him. And the criminal conduct Perez impliedly threatened to publicly disclose was entirely unrelated to any alleged injury suffered by Moore or by Perez himself. (See *Flatley*, *supra*, 39 Cal.4th at pp. 330–331 ["the threat to disclose criminal activity entirely unrelated to any alleged injury suffered by [the] client 'exceed[s]

20

the limits of respondent's representation of his client' and is itself evidence of extortion"].)

Thus, viewed in context, we conclude Perez's statements constituted extortion as a matter of law. The statements therefore do not arise from protected activity, and we reverse the portion of the court's order granting the attorney respondents' special motion to strike Jeffers's cause of action for extortion.

We reach the opposite conclusion with respect to Jeffers's breach of fiduciary duty claim. In the complaint, Jeffers alleges that Perez breached his duties of loyalty and confidentiality to her by (1) "actively represent[ing] . . . Moore," whose interests were adverse to those of Jeffers, in his efforts to "force a sale of [unit 5]," (2) "rel[ying] on confidential information obtained while representing . . . Jeffers [in the probate action] in formulating [Perez's] representation of . . . Moore against [the] LLC," and (3) "impliedly threaten[ing] to present criminal charges" against Jeffers in the March 1 declaration and the March 22 letter, in violation of rule 3.10 of the Rules of Professional Conduct. Jeffers further alleges Perez's law firm is liable for these breaches because the firm "authorized, ratified and approved of" Perez's actions.

There is some force to Jeffers's argument that Perez's "alleged acts of representing [a] client[ ] with interests adverse to his former client and using [Jeffers's] confidential information in the new representation do not constitute protected activity under the anti-SLAPP law," as the mere acts of agreeing to represent or advising a client do not necessarily involve speech or petitioning activity. (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 314 (*Wittenberg*), citing, inter alia, *Benasra v. Mitchell Silberberg & Knupp LLP* (2004) 123 Cal.App.4th 1179 and *Freeman v. Schack* (2007) 154 Cal.App.4th 719.) And as set forth, *ante*, we conclude

21

Perez's statements in the March 1 declaration and March 22 letter do not constitute protected activity.

But Perez's representation of Moore also included conduct falling squarely within section 425.16's enumerated categories—namely, the filing of the complaint in the third Moore lawsuit. (See § 425.16, subd. (e)(1) & (2) [written statements made "before a . . . judicial proceeding" or "in connection with an issue under consideration . . . by a . . . judicial body" constitute protected activity].) Jeffers nonetheless insists her breach of fiduciary duty claim is not subject to the anti-SLAPP statute because the "gravamen" of her claim is Perez's breach of his duty of loyalty—and not Perez's speech or petitioning activity.

This argument fails because our high court expressly has rejected the "gravamen" test that Jeffers urges us to apply. (See *Bonni*, *supra*, 11 Cal.5th at p. 1011; *ibid.* ["[i]f we were . . . to adopt [the] proposed gravamen approach, we would . . . risk saddling courts with an obligation to settle intractable, almost metaphysical problems about the 'essence' of a cause of action that encompasses multiple claims"].) Rather, "[w]hen relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at [the first step of the anti-SLAPP analysis]. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, *supra*, 1 Cal.5th at p. 396.)

We recognize that our high court also has "reaffirmed that '[a]ssertions that are "merely incidental" or "collateral" are not subject to section 425.16. [Citations.] Allegations of protected activity that merely provide context, without supporting a claim

22

for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation.]" (*Bonni*, *supra*, 11 Cal.5th at p. 1012.)  But this does not aid Jeffers, because the complaint frames the filing of the third Moore lawsuit as a central feature of Perez's alleged wrongdoing—and not merely as incidental background.

We therefore conclude that Jeffers's breach of fiduciary duty claim arises, at least in part, from protected activity.  As such, Jeffers bears the burden of demonstrating a probability of prevailing on the claim.  (See *Baral*, *supra*, 1 Cal.5th at p. 396; *Wittenberg*, *supra*, 50 Cal.App.5th at p. 315 ["[b]ecause the . . . causes of action seek relief based, in part, on . . . specific allegations of [the defendant's] litigation activity, the burden shifted to [the plaintiff] to demonstrate the minimal merit of the challenged causes of action to the extent they are based on protected litigation conduct"].)

### C.   Jeffers Has Demonstrated the Requisite Probability of Success on Her Breach of Fiduciary Duty Claim

Jeffers contends that Perez, as her former counsel, breached his fiduciary duties to her by representing Moore in his efforts to acquire unit 5 and by using Jeffers's confidential information in the course of that representation.  Jeffers further contends that Perez's current law firm is vicariously liable for Perez's breaches.  We agree sufficient evidence demonstrates a probability of success on these claims.

"The elements of a cause of action for breach of fiduciary duty/duty of loyalty are:  (1) the existence of a relationship giving rise to a fiduciary duty/duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach. [Citation.]" (*Wittenberg*, *supra*, 50 Cal.App.5th at p. 312, fn. 7.)

23

As to the first element, Perez does not dispute that he owes a fiduciary duty to Jeffers as his former client. (See *Styles v. Mumbert* (2008) 164 Cal.App.4th 1163, 1167 ["an attorney continues to owe a former client a fiduciary duty even after the termination of the relationship"].) Further, it is undisputed that Perez was a partner at his current law firm when he allegedly breached his fiduciary duties to Jeffers, and "[a] law partnership, as any partnership, is vicariously liable 'for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with authority of the partnership.' " (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP* (2007) 150 Cal.App.4th 384, 391 [affirming dismissal of direct breach of fiduciary duty claim by nonclient against law firm, but finding triable issues of fact existed as to firm's vicarious liability for firm partner's alleged wrongdoing]; see Corp. Code, § 16305, subd. (a).) Jeffers therefore has made an adequate showing with respect to the first element of her breach of fiduciary duty claim.

Turning to the second element, "[a]n attorney's fiduciary obligations to his or her client include the duties of loyalty and confidentiality. ' "[T]he effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. [Citation.] . . . [C]ourts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship." [Citations.] Accordingly, "an attorney is forbidden to do either of two things after severing [the] relationship with a former client. [The attorney] may not do anything which will injuriously affect [the] former client in any matter in which [the attorney] formerly represented [the client] nor may [the attorney] at any time use

24

against [the] former client knowledge or information acquired by virtue of the previous relationship." [Citations.]' " (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1174 (*Fremont*).) Further, the duties of loyalty and confidentiality prohibit an attorney "from taking a former client's confidences significantly into account in acting in the attorney's own interest even if there is no second client and no confidences are disclosed." (*Ibid.*)

Perez insists there is "no evidence that [he] relied on confidential information obtained while representing Jeffers in formulating his representation of Moore." But Perez's March 1 declaration and March 22 letter constitute such prima facie evidence: These documents support that Perez relied on confidential information from the probate action—namely, Perez's privileged legal advice to Jeffers regarding certain tax issues involving the unit and Jeffers's purported failure to follow that advice—to defend against Jeffers's request for attorney fees in the third Moore lawsuit and to dissuade Jeffers from filing the instant suit against Moore, Perez, and his law firm.

Perez insists the information in his declaration and letter is not confidential because, under the crime-fraud exception set forth in Evidence Code section 956, "the attorney[-]client privilege does not apply to when a client seeks an attorney's help in committing a crime or fraud." Perez, however, fails to demonstrate that exception applies here as a matter of law, and the exception therefore cannot defeat Jeffers's claim at this stage in the litigation. (See *Fremont, supra,* 198 Cal.App.4th at p. 1166 ["[t]he defendant cannot defeat the plaintiff's evidentiary showing [for purposes of opposing an anti-SLAPP special motion to strike] by presenting evidence that merely contradicts that evidence but does not establish as a matter of law that the plaintiff cannot prevail"].) We likewise reject Perez's

25

argument that the litigation privilege bars Jeffers's breach of fiduciary duty claim.  (See *Fremont, supra,* 198 Cal.App.4th at p. 1160 ["the litigation privilege is inapplicable in an action by a former client against an attorney arising from breach of professional duties"].)

Finally, as to the third element of damages, in Jeffers's declaration filed in opposition to the anti-SLAPP motions, she attests in pertinent part:  "Perez'[s] conduct represent[ing] Moore injuriously affected me"; "I understood Perez'[s] accusations of 'multiple crimes' to be threats that he would report me for 'multiple crimes' if I filed [suit against him]"; and "I have suffered and will continue to suffer pain and suffering, and mental anguish and emotional distress."  Taken together, these attestations constitute prima facie evidence of damages for purposes of the anti-SLAPP inquiry.[5]  (See *Kaushansky v. Stonecroft Attorneys, APC* (2025) 109 Cal.App.5th 788, 805–806 ["[e]motional distress damages may be recoverable if directly caused by an attorney's conduct in breach of his fiduciary duties"].)

Accordingly, we conclude that Jeffers has established the requisite probability of success on her breach of fiduciary duty claim.

---

[5] Before the trial court, Moore did not object to the admissibility of these statements in Jeffers's declaration.  And the court overruled the attorney respondents' evidentiary objections to the statements.  No other portions of the declarations filed by Jeffers or her mortgage broker, Spitz, are material to our analysis.  We therefore need not further address the attorney respondents' argument that, on appeal, Jeffers and the LLC seek improperly to rely on portions of the declarations the trial court ruled inadmissible.

26

### D. Jeffers and the LLC Fail to Demonstrate a Probability of Success on Their Two Remaining Claims

#### 1. *Financial Elder Abuse*

"The Legislature enacted the [Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.)] to protect elders by providing enhanced remedies to encourage private civil enforcement of laws against elder abuse and neglect. [Citation.] . . . [Citation.]  The proscribed conduct includes financial abuse.  The financial abuse provisions are, in part, premised on the Legislature's belief that in addition to being subject to the general rules of contract, financial agreements entered into by elders should be subject to special scrutiny." (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 478 (*Bounds*).)

The elements of financial elder abuse are:  (1) "[t]ak[ing], secret[ing], appropriat[ing], obtain[ing], or retain[ing]" or "[a]ssist[ing] in taking, secreting, appropriating, obtaining, or retaining," (2) "real or personal property," (3) "of an elder or dependent adult," and (4) "for a wrongful use or with intent to defraud, or both."  (Welf. & Inst. Code, § 15610.30, subd. (a)(1)–(2).)

Jeffers alleges that Moore committed financial elder abuse against her by (1) sending the March 26, 2022 "notice of acceptance" to purchase the unit, (2) filing the third Moore lawsuit and lis pendens, (3) withholding rent payments under the deeds of trust, and (4) recording the notice of default against the unit. (Capitalization omitted.)  She concedes that none of these actions caused her to lose possession of the unit, but urges they nonetheless constituted a "taking" for purposes of the elder abuse statute.

In support, she relies on *Bounds*, where two individuals and their associated business entities (the KMA parties) allegedly exploited the deteriorating mental condition of Bounds, an

27

88-year-old widow with Alzheimer's disease, to secure her signature on escrow instructions authorizing the sale of real property held by her trust. (*Bounds*, *supra*, 229 Cal.App.4th at p. 472.) When Bounds's attorney discovered the instructions, he terminated the escrow on her behalf. (*Id.* at p. 475.) As a result, "the Trust retain[ed] title to, and Bounds remain[ed] in possession of, the property." (*Id.* at p. 472.) Certain of the KMA parties then sued to enforce their right to purchase the property. (*Id.* at p. 475.) Bounds and her trust filed a cross-complaint alleging, inter alia, a cause of action for elder abuse. (*Ibid.*) They argued the KMA parties' conduct effected a "taking" of the property because "the existence of the escrow instructions significantly impair[ed] [Bounds's] right to sell the property at fair market value or to use it to secure a loan on favorable terms." (*Id.* at p. 472.)

The appellate court agreed, explaining in pertinent part: "[I]n any sales or loan transaction concerning the property, petitioners[, Bounds and the trust,] would be required to disclose KMA's claim that it has a legally enforceable right to acquire the real property. [Citation.] This disclosure would, in turn, impair petitioners' ability to sell the real property for fair market value or to use it as security to obtain a loan on reasonable and commercially acceptable terms. The [operative cross-complaint] thus alleges, in substance, that the existence of the escrow instructions significantly interferes with petitioners' rights to use the realty as they see fit. These allegations regarding the adverse financial impact of the escrow instructions are sufficient to allege a 'depriv[ation] of [a] property right . . . by means of an agreement' [citation] because petitioners have been deprived of one of the incidents of property ownership: the right to strike the best bargain possible in either selling or encumbering the real property." (*Bounds*, *supra*, 229 Cal.App.4th at p. 480.)

The relevant facts here are unlike those in *Bounds*. The March 26, 2022 notice of acceptance—signed only by Moore and not made in response to any offer by Jeffers or the LLC—did not create "a legally enforceable right to acquire the real property." (*Bounds*, *supra*, 229 Cal.App.4th at p. 480.) And although the complaint in the third Moore lawsuit and the lis pendens purported to assert such a right—and may have impaired Jeffers's ability to use the unit as security to obtain a loan—those filings fall within the scope of the litigation privilege. (See Civ. Code, § 47, subd. (b)(1); *id.*, subd. (b)(4) [a recorded lis pendens is a privileged publication if it "identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property"].) Finally, even if Moore's decision to withhold rent and record the notice of default impaired the unit's value, Jeffers fails to demonstrate these actions were "wrongful." (Welf. & Inst. Code, § 15610.30, subd. (a)(1) & (2).) The deeds of trust expressly authorized Moore to take such actions, and Jeffers does not contend otherwise. (See, e.g., *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527–528 [exercise of legitimate, contractual foreclosure rights did not constitute a "wrongful use" under the elder abuse statutes].)

Accordingly, we conclude Jeffers fails to demonstrate a reasonable probability of prevailing on her elder abuse claim. In light of our conclusion, we need not address Moore's contention that Jeffers lacks standing to pursue the claim because the LLC owns the unit at issue.

### 2.  *Malicious Prosecution*

To establish a claim of malicious prosecution, the plaintiff must demonstrate with respect to the prior action that it "(1) was commenced by or at the direction of the defendant and was pursued

to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292.) We conclude the LLC fails to demonstrate a reasonable probability of prevailing on the "no probable cause" element of its malicious prosecution claim.

"The question of probable cause is 'whether as an objective matter, the prior action was legally tenable or not.' [Citation.] 'A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him.' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 292.)

"Reasonable lawyers can differ, some seeing as meritless suits which others believe have merit, and some seeing as totally and completely without merit suits which others see as only marginally meritless. Suits which *all* reasonable lawyers agree totally lack merit—that is, those which lack probable cause—are the least meritorious of all meritless suits. Only this subgroup of meritless suits presents no probable cause." (*Robert v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 382.)

Here, we are not persuaded that all reasonable lawyers would agree the third Moore lawsuit totally and completely lacked merit. Moore's strongest theory in support of his claims proceeded as follows: (1) the trial court in Moore's prior consolidated actions found the Bullucks' assignment of their "participating tenant" rights to Moore was "valid," but that the Bullucks' rights as participating tenants to purchase the property at the TORCA price had expired prior to the assignment, (2) the express terms of the consent to conditions agreement require the building owner "to offer the . . . right to purchase [the] . . . unit" at the TORCA price "for a

30

period of not less than two . . . years from the date of final approval by the California Department of Real Estate," (3) because the earlier subdivision report had expired, the March 2022 report constituted that "final approval" under the pertinent Business and Professions Code sections, and (4) issuance of the March 2022 report therefore triggered a new two-year period during which Moore could purchase unit 5 at its TORCA price.

The LLC does not dispute that the findings in the prior action and the plain language of the consent to conditions agreement provide support for Moore's theory. Nor does the LLC contend that any published case squarely addresses and rejects Moore's theory in the context of a TORCA-related action. On this record, we cannot conclude the third Moore lawsuit was so utterly meritless that it "was brought without probable cause." (*Soukup*, *supra*, 39 Cal.4th at p. 292.) The LLC thus fails to demonstrate a probability of prevailing on this element of its malicious prosecution claim, and we need not address the parties' contentions concerning the remaining elements.

Accordingly, we conclude the trial court properly granted the anti-SLAPP special motions to strike.

### E. Attorney Fees

Finally, because we conclude the trial court erred in striking Jeffers's claims for (1) extortion and (2) breach of fiduciary duty, we grant Jeffers's request that we direct the court on remand to revisit the portion of its order awarding the attorney respondents "reasonable attorney fees and costs" in connection with their special motion to strike those claims.

We deny the attorney respondents' request for attorney fees on appeal because we conclude they are not "prevailing" parties. (See *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th

31

1242, 1253.) As to Moore's request for attorney fees on appeal, "[he] may request an award of attorney fees by a properly filed motion with the trial court." (*Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1033.)

## DISPOSITION

The portions of the challenged order striking Jeffers's claims for extortion and breach of fiduciary duty are reversed. On remand, we direct the trial court to reinstate those causes of action. We further direct the trial court to reconsider its award of prevailing party attorney fees to the attorney respondents in connection with their anti-SLAPP special motion to strike, in light of our reinstatement of two of Jeffers's claims. In all other respects, the order granting the special motions to strike is affirmed.

Moore is awarded his costs on appeal. Jeffers, the LLC, and the attorney respondents shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

WEINGART, J.

M. KIM, J.